UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
CSI INVESTMENT PARTNERS II, L.P.,
Delaware limited partnership, CIS
ACQUISITION PARTNERS, L.P., a Delaware
limited partnership, CANTERBURY MEZZANINE
CAPITAL, L.P., a Delaware limited
partnership, DAVID C THOMPSON, M. GERARD
KEEHAN, VINEET PRUTHI, DONALD J. SHEA, JAMES
M. ROTHE, MICHAEL COSSEL, JOHN J. ADAMS,
ROBERT E. RICHARDSON, MARILYN SCHWARTZ,
and CHARLES CAUDLE,

                    Plaintiffs,


          -against-                        00 Civ. 1422
_____         OPINION
CENDANT CORPORATION, a Delaware
corporation, HENRY SILVERMAN, SAMUEL
KATZ, and COSMO CORIGLIANO,
                    Defendants.
----------------------------------------X
CENDANT CORPORATION,
                    Counterclaim-Plaintiff


          -against-

CSI INVESTMENT PARTNERS II, L.P., CIS
ACQUISITION PARTNERS, L.P., CANTERBURY
MEZZANINE CAPITAL, L.P., DAVID C. THOMPSON,
M. GERARD KEEHAN, VINEET PRUTHI, DONALD J.
SHEA, JAMES M. ROTHE, MICHAEL COSSEL, JOHN
J. ADAMS, ROBERT E. RICHARDSON, MARILYN
SCHWARTZ, CHARLES CAUDLE,
                    Counterclaim-Defendants,

-and-

TONYA CARMICHAEL, LINCOLNSHIRE EQUITY, INC.,
LINCOLNSHIRE MANAGEMENT, INC., STEVE KUMBLE,
and THOMAS J. MALONEY,
          Additional Counterclaim-Defendants.
----------------------------------------X

DEBORAH A. BATTS, United States District Judge.

Plaintiffs CSI Investment Partners II, L.P., CIS Acquisition Partners, L.P., Canterbury Mezzanine Capital, L.P., David C. Thompson, M. Gerard Keehan, Vineet Pruthi, Donald J. Shea, James M. Rothe, Michael Cossel, John J. Adams, Robert E. Richardson, Marilyn Schwartz, and Charles Caudle (collectively referred to as "Sellers" or "Plaintiffs") sue Defendants Cendant Corporation ("Cendant"), Henry Silverman, Samuel Katz, and Cosmo Corigliano based on alleged violations of a Stock Purchase Agreement ("SPA").  The SPA provided for the sale of Credentials Services International, Inc. ("Credentials") by Sellers to Cendant for a set price of $125 million, plus an additional amount which was contingent on Credentials' future performance ("Acquisition"). Plaintiffs allege, <u>inter alia</u>, that Cendant fraudulently induced them to agree to the contingent payment clause of the SPA by misrepresenting to Sellers that it would use certain marketing strategies to market Credentials' products and by not informing them about a wide-scale accounting fraud within Cendant's ranks. Cendant, while conceding the existence of "accounting irregularities" among its ranks, asserts that it did not fraudulently omit or misrepresent any information in the course of the SPA negotiations.  Cendant also argues that, in any event, Sellers failed to inform Defendants that Credentials had

2

allegedly violated the Fair Credit Reporting Act and breached a prior agreement with Non-Party Experian, Inc.  This failure to inform, Defendants argue, is a defense to any liability they may owe Plaintiffs.

Plaintiffs have brought a securities fraud claim against all Defendants pursuant to 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j ("Count One")[1]; a common law fraud claim against all Defendants ("Count Two"); three breach of contract claims against Cendant ("Count Three", "Count Four", and "Count Five"); a claim for breach of the covenant of good faith and fair dealing against Cendant ("Count Six"); an accounting claim against Cendant ("Count Seven"); a negligent misrepresentation claim against all Defendants ("Count Eight")[2]; and a claim for declaratory relief against Cendant (Count Nine").[3]

Cendant has brought a common law fraud counterclaim against

---

[1] Count One has already been dismissed against Defendants Katz and Silverman.  (Order Adopting Report & Recommendation, May 21, 2002.)

[2] Count Eight has already been dismissed against Corigliano. (Order Adopting Report & Recommendation, May 21, 2002.)

[3] Pursuant to the Stipulation so-ordered by the Court on May 9, 2006, Plaintiffs voluntarily dismissed with prejudice Counts Five and Nine.  (See Document 123, No. 00 Civ. 1422 (DAB).)

all Counterclaim-Defendants[4] ("Counterclaim One"); an
indemnification counterclaim against all Plaintiffs
("Counterclaim Two"); a breach of fiduciary duty counterclaim
against Plaintiffs Michael Cossel, Gerard Keehan, and Robert E.
Richardson ("Counterclaim Three"); a breach of the covenant of
lawful operation counterclaim against all Plaintiffs
("Counterclaim Four"); and an unjust enrichment claim against all
Counterclaim-Defendants ("Counterclaim Five").

　　　Now before the Court are Cendant's Motion for Summary
Judgment on Counts One, Two, Three, Four, Six, Seven, and Eight,
as well as Defendants Henry Silverman and Samuel Katz' Motion for
Summary Judgment on Counts Two and Eight.  Also before the Court
are Counterclaim-Defendants' Motion for Summary Judgment on all
of Cendant's counterclaims, Plaintiffs' Motion for Summary
Judgment on Count Four of the Third Amended Complaint, and
Plaintiffs' Motion for Sanctions for Pervasive Discovery Abuse
and Spoliation of Evidence.  For the reasons stated below,
Defendant Cendant's Motion for Summary Judgment shall be GRANTED
IN PART and DENIED IN PART, Defendants Silverman and Katz' Motion

---

[4] "Counterclaim-Defendants" is used to refer to all
Plaintiffs as well as the additional Counterclaim-Defendants
brought into this suit by Cendant: Tonya Carmichael, Lincolnshire
Equity, Inc., Lincolnshire Management, Inc., Steve Kumble, and
Thomas J. Maloney.

for Summary Judgment shall be GRANTED, Counterclaim-Defendants'
Motion for Summary Judgment on the Counterclaims shall be
GRANTED, Plaintiffs' Motion for Summary Judgment on Count Four of
the Third Amended Complaint shall be GRANTED, and Plaintiffs'
Motion for Sanctions for Pervasive Discovery Abuse and Spoliation
of Evidence shall be GRANTED IN PART and DENIED IN PART.  As
well, summary judgment shall be GRANTED in Plaintiffs' favor on
Count Three of the Third Amended Complaint.


## I. BACKGROUND

A.   The Parties

      At all times relevant to the Complaint, Plaintiffs CSI
Investment Partners II, L.P. ("CSI") and CIS Acquisition
Partners, L.P. ("CIS") were limited partnerships managed by
Counterclaim-Defendant Lincolnshire Management, Inc.
("Lincolnshire").  (Maloney Dep. 9-12, at Lawler Aff. of Jan. 30,
2007[5], Ex. 5.)  Together, CSI and CIS held 80% of the interest in

_____

      [5] Richard F. Lawler, Counsel for Defendants, submitted two
different sets of documents entitled "Affidavit of Richard F.
Lawler".  For citation purposes, the Affidavit of Richard F.
Lawler which was filed in conjunction with Defendants' Motion for
Summary Judgment will be cited as "Lawler Aff. of Jan. 30, 2007",
and the Affidavit of Richard F. Lawler which was filed in
opposition to both Sellers' Motion for Summary Judgment on Count
Four and Counterclaim-Defendants' Motion for Summary Judgment on
the Counterclaims will be cited as "Lawler Aff. of Feb. 28, 2007"

Credentials, a corporation which provided information to consumers about their credit reports.  (Credentials Preliminary Prospectus JPHQ 00003, at Lawler Aff. of Jan. 30, 2007, Ex. 5.) Plaintiff Canterbury Mezzanine Capital, L.P. ("Canterbury") is an investment fund which owned 10.8% of Credentials' stock. (Maloney Dep. 51-52.)

According to a Credentials Prospectus, Credentials "provide[d] value-added programs that enable[d] customers to monitor the accuracy of their personal credit data that [was] collected and held by credit reporting bureaus."  (Credentials Preliminary Prospectus JPHQ 00003, at Lawler Aff. of Jan. 30, 2007, Ex. 1.)  Credentials provided this information to its customers "in a readily understandable, readable format".  (Id.) It marketed its programs to consumers using "direct marketing techniques, consisting of direct mail and telemarketing campaigns conducted through endorsed co-marketing relationships with major credit card issuers . . . such as banks, retailers, and oil companies."  (Id.)[6]

The following Individual Plaintiffs were officers and/or employees of Credentials, and also owned shares in Credentials just prior to the Acquisition (Ex. A of the SPA, at Pls.' 56.1

---

[6] Credentials' pre-Acquisition business arrangements will be described in more detail at Section I(B), infra.

Stmt., Ex. 26 (hereinafter cited as "SPA")): David C. Thompson ("Thompson") joined Credentials in 1996 as Chief Financial Officer and by 1997 he was the Chief Executive Officer (Thompson Dep. 58:16-17, 64:5-65:5, at Lawler Aff. of Jan. 30, 2007, Ex. 12); M. Gerard Keehan ("Keehan") was an executive vice president (Keehan Dep. 22:4-22, 29:16-19, at Lawler Aff. of Jan. 30, 2007, Ex. 13); Vineet Pruthi ("Pruthi") was the Chief Financial Officer after Thompson was promoted to CEO (Pruthi Dep. 26:14-17, 37:4-9, at Lawler Aff. of Jan. 30, 2007, Ex. 4); Donald J. Shea ("Shea") served as senior vice president of new products (Shea Dep. 31:7-10, 32:3-5, 39:20, 40:4, at Lawler Aff. of Jan. 30, 2007, Ex. 14); James M. Rothe ("Rothe") served as senior vice president of sales (Rothe Dep. 8:19-23, 61:19-21, at Lawler Aff. of Jan. 30, 2007, Ex. 15); Michael Cossel ("Cossel") served as executive vice president of operations and systems (Cossel Dep. 39:22-24, at Lawler Aff. of Jan. 30, 2007, Ex. 16); John A. Adams ("Adams") became a vice president in July 1997 (Adams Dep. 28:14-17; at Lawler Aff. of Jan. 30, 2007, Ex. 17); Robert E. Richardson ("Richardson") became a vice president during the late summer of 1996 (Richardson Dep. 36:14-18, at Lawler Aff. of Jan. 30, 2007, Ex. 18); Marilyn Schwartz ("Schwartz") was a senior vice president (Schwartz Dep. 35:6-20, at Lawler Aff. of Jan. 30, 2007, Ex. 19); and Charles Caudle ("Caudle") preceded Thompson as

7

the Chief Executive Officer, but then became vice chairman of the board in 1997 (Caudle Dep. 21:17-19, 23:23, 56:8, at Lawler Aff. of Jan. 30, 2007, Ex. 20).  Counterclaim-Defendant Tonya Carmichael worked at Credentials as a vice president of production.  (Carmichael Dep. 19:23-25, at Lawler Aff. of Jan. 30, 2007, Ex. 22.)  She was responsible for direct mail acquisition and fulfillment.  (Id. at 19:7-22)  Counterclaim-Defendants Steven J. Kumble and Thomas J. Maloney were Chief Executive Officer and president of Lincolnshire, respectively. (Kumble Dep. 44:13-16, at Lawler Aff. of Jan. 30, 2007, Ex. 7; Maloney Dep. 73:4-9, at Lawler Aff. of Jan. 30, 2007, Ex. 10.)

Defendant Cendant was a corporation organized under the laws of the state of Delaware with its principal place of business located in the state of New Jersey.  (Third Am. Compl. ¶ 10; Cendant Am. Answer ¶ 10.)  Cendant was created when CUC International, Inc. ("CUC") and HFS Incorporated ("HFS") merged in December 1997 ("CUC-HFS merger").[7]  (Cendant Form 10K at SAR 14503, at Lawler Aff. of Jan. 30, 2007, Ex. 25.)  Cendant provided various membership-based consumer services, travel services, and real estate services.  (Id.)  Cendant also furnished for its customers a service known as PrivacyGuard,

---

[7] The CUC-HFS merger will be described in more detail at Section I(C), infra.

which provided, among other things, credit histories.  (Id. at

SAR 14526.)  Prior to the CUC-HFS merger, Defendant Henry

Silverman ("Silverman") was the Chief Executive Officer of HFS,

while Defendant Samuel Katz ("Katz") was its Senior Vice

President of Acquisitions.  (Third Am. Compl. ¶¶ 11-12; Am.

Answer ¶¶ 11-12.)   After the CUC-HFS merger, Silverman became

Cendant's President and Chief Executive Officer, and Katz became

Cendant's Executive Vice President of Strategic Development.

(Third Am. Compl. ¶¶ 11-12; Am. Answer ¶¶ 11-12.)  Defendant

Cosmo Corigliano ("Corigliano") was Chief Financial Officer of

Financial Services at Cendant (Lawler Aff. of Jan. 30, 2007 ¶ 27;

Third Am. Compl. ¶ 13); he was terminated for his role in an

accounting fraud which he precipitated at CUC and which will be

discussed in more detail at Section I(D), infra.[8]  (Lawler Aff.

of Jan. 30, 2007, Ex. 26.)  The fraud was the basis of charges

for wire fraud and conspiracy to which Corigliano ultimately

pleaded guilty in the United States District Court for the

District of New Jersey.  (U.S. v. Corigliano, Crim. No. 00-379

---

[8] There is no reference in the parties' submissions to
Corigliano's start date.  As for Corigliano's termination date,
Silverman testified that he "had made the determination to fire"
him in December of 1997 (Silverman Dep. 238:4 - 240:17, at Lawler
Aff. of Jan. 30, 2007, Ex. 3), but announced Corigliano's
resignation during a conference call on April 9, 1998 (Id.).  A
letter to Corigliano dated April 16, 1998 formally terminated him
for cause.  (Lawler Aff. of Jan. 30, 2007, Ex. 26.)

(WHW) (D.N.J.), Tr., Jun. 14, 2000, at Lawler Aff. of Jan. 30, 2007, Ex. 48.)

B.   Credentials' Pre-Acquisition Business Arrangements

_____Credentials obtained the names of potential customers for its credit monitoring products by entering into agreements with banks and other entities.  (Counterclaim-Defs.' 56.1 Stmt. ¶ 16; Counterclaim Pls.' 56.1 Stmt. ¶ 16.)  In exchange for a percentage of Credentials' sales revenue, the banks furnished Credentials with their customers' identifying information and gave Credentials permission to use that information to contact those customers.  (See, e.g., Pls.' 56.1 Stmt. on Count Four, Ex. 1.)

The credit reporting agency relevant to the instant Motions is TRW, Inc., a predecessor of Experian, Inc. ("Experian").  On October 18, 1994, Credentials executed a contract with Experian, in which Experian agreed to supply credit reports to Credentials, so that Credentials in turn could market its credit report services to Experian's customers.  (Consumer Credit Subscriber Service Agreement ¶ 1.1, at Counterclaim-Defs.' 56.1 Stmt., Ex. 4 (hereinafter "Experian Agreement"); Counterclaim-Defs.' 56.1 Stmt. ¶ 6; Am. Answer at 68 ¶ 14.)  The Experian Agreement provided that:

10

> [Credentials] shall promptly identify to [Experian]
> all of its present members and all of its future
> members added from time to time and shall also
> promptly notify [Experian] when a member's
> membership lapses or is canceled for any reason.
> [Experian] shall furnish to [Credentials] when
> requested by CIS as described herein all credit
> information it routinely provides to consumers when
> they request their [Experian] Reports and shall
> identify to [Credentials] all codes used therein
> and their respective meanings.  In order to
> facilitate the provision of such credit
> information, [Experian] shall provide to
> [Credentials] real-time, on-line access to
> [Experian] Reports.

(Experian Agreement, ¶ 1.1.)  The Experian Agreement further

provided that "[Experian] shall provide to [Credentials] access

to [Experian] Reports in the format in which it routinely

discloses [Experian] Reports to consumers." (Id. ¶ 1.3.)  Also

stated in the Experian Agreement was Credentials' promise to

"have on file written permission from every [Credentials] member

to so obtain a[n] [Experian] Report and provide it to the

member." (Id. ¶ 4(iii).)[9]

---

[9] The parties dispute the extent to which Credentials
concealed from Experian its use of one-step telemarketing, i.e.,
its failure to get written permission from customers before
ordering and sending their credit reports. (Counterclaim-Defs.'
56.1 Stmt. ¶¶ 39, 44; Counterclaim-Pls.' 56.1 Stmt. ¶¶ 39, 44.)
Employees of Credentials, including Plaintiff Thompson, testified
that Experian was fully apprised of Credentials' use of one-step
telemarketing. (See, e.g., Thompson Dep. 163:19-165:23, at
Counterclaim-Defs.' 56.1 Stmt., Ex. 22.)  Plaintiff Keehan
testified that "Experian and Credentials were very close . . . .
Employees crossed over, you know, worked in Credentials, worked
there . . . . They approved every written script, every written

Credentials contacted Experian's and other potential customers using various marketing practices, including direct mail.  (Pls.' 56.1 Stmt. ¶ 47; Defs.' 56.1 Stmt. ¶ 47; Cossel Dep. 52:15-25, at Lawler Aff. of Jan. 30, 2007, Ex. 16.) Beginning in or about August 1996, Credentials also used a method known as "one-step telemarketing".  (Counterclaim-Defs.' 56.1 Stmt., Ex. 83.)

One-step telemarketing was a method by which Credentials telemarketers would record a customer's giving oral permission to access her credit report before sending it to her.  (Sheehan Dep. 40:15 - 43:9; at Counterclaim-Defs.' 56.1 Stmt., Ex. 10.)  The one-step telemarketing script used by Credentials opened with a description of its credit report service and proceeded to explain that a customer who joined Credentials would receive a copy of her credit report.  (Counterclaim-Defs.' 56.1 Stmt., Ex. 5, at Trilegiant CSI/CEN 000029.)  The telemarketer then asked the customer whether she wanted to begin an introductory membership with Credentials and receive a copy of her credit report.  (Id.

_____

solicitation piece . . . ."   (Keehan Dep. 138:14-22, at Counterclaim-Defs.' 56.1 Stmt., Ex. 16.)  An Experian employee testified that "there might have been times we heard [about Credentials' one-step telemarketing] . . . . They may have even admitted it.  If they did, we said they couldn't."  (Sturgess Dep. 41:21-23, at Lawler Aff. of Jan. 30, 2007 of Feb. 28, 2007, Ex. 16.)

at Trilegiant CSI/CEN 000030.)  If the customer agreed to receive
the credit report, the telemarketer began recording the
conversation (with the customer's permission), and then verified
the customer's identification information.  (Id. at Trilegiant
CSI/CEN 000030 - 000031.)  During the recorded portion of the
conversation, the telemarketer clarified that the information was
being verified to ensure that the customer would "get an accurate
credit report . . . ."  (Id. at Trilegiant CSI/CEN 000031.)

　　　Once a Credentials telemarketer had recorded the customer's
oral permission, Credentials would contact a credit reporting
agency for a copy of the customer's credit report.  After
receiving a customer's credit report from Experian, Credentials
provided it to a print vendor in tape format who would print it
and supply a hard copy of it to Credentials.  (Credentials
Preliminary Prospectus at JPHQ 00032, at Lawler Aff. of Jan. 30,
2007, Ex. 1.)  Credentials sent the hard copies to the new
customer, along with a welcome letter to Credentials, a letter
containing "information from Experian about [the customer's]
credit report and credit rights", and a general brochure about
the uses of credit reports.  (Lawler Aff. of Feb. 28, 2007, Exs.
43-45.)

　　　In early 1997, Credentials had decided to pursue an Initial
Public Offering ("IPO") of its stock, and had begun marketing

13

Credentials to investors.  (Maloney Dep. 191:22 - 194:19, at

Lawler Aff. of Jan. 30, 2007, Ex. 10; Defs.' 56.1 Stmt. ¶ 53;

Pls.' 56.1 Stmt. ¶ 53.)  The IPO valued Credentials at

$160,000,000.00 to $210,000,000.00.  (Pls. 56.1 Stmt., Ex. 79, at

1125.)  Later that year, Credentials had postponed its IPO due to

an unreceptive IPO market.  (Maloney Dep. 197:2-14, at Lawler

Aff. of Jan. 30, 2007, Ex. 10.)

On October 29, 1997, Credentials entered an Agreement with

Citibank, whereby Citibank accepted a commission in exchange for

permitting Credentials to market its credit report services to

Citibank's customers.  ("Citibank Agreement").  (Pls.' 56.1 Stmt.

on Count Four, Ex. 1.)  The Citibank Agreement provided that a

customer would be "enrolled" in Credentials' program when she

"orally [agreed] during the course of a Telemarketing

Solicitation to enroll in the Program" (Pls.' 56.1 Stmt. on Count

Four, Ex. 1, at § 4.1), and that Credentials would thereafter

"mail membership fulfillment kits to all new Program members",

which included a "Credit Report" (Pls.' 56.1 Stmt. on Count Four,

Ex. 1, at §§ 4.1 & 4.4).  Section 5.1(b) of the Citibank

Agreement ensured that Credentials would pay Citibank at least

$9,000,000.00 by January 15, 1999 even if Credentials did not

obtain enough new members to warrant $9,000,000.00 in commission

payments:

> For the period starting with the effective date
> hereof through December 1998, [Credentials] shall
> pay [Citibank] total compensation based on net
> membership revenue, as set forth in Article 5.1(a)
> above, that is not less than nine million dollars
> ($9,000,000.00).  Should the compensation paid to
> [Citibank] based on net membership revenues for
> such period be less than nine million dollars
> ($9,000,000.00), [Credentials] shall remit to
> [Citibank] on or before January 15, 1999, the
> difference between the compensation paid as of
> December 31, 1998, and nine million dollars
> ($9,000,000.00).

(Pls.' 56.1 Stmt. on Count Four, Ex. 1, § 5.1(b).)

## C.    CUC and HFS Merge to Form Cendant

A Joint Proxy Statement sent to CUC and HFS shareholders on August 28, 1997 to approve the CUC-HFS merger described HFS as "one of the foremost global services providers . . . . [providing] services to consumers through intermediaries in the travel and real estate industries."  (Pls.' 56.1 Stmt., Ex. 1 at CSI/CEN 257168.)  The Joint Proxy Statement described CUC as:

> a leading technology-driven membership-based
> consumer services company, providing approximately
> 69 million members with access to a variety of
> goods and services worldwide.  These memberships
> include such components as shopping, travel, auto,
> dining, home improvement, lifestyle, vacation
> exchange, credit card and checking account
> enhancement packages, financial products and
> discount programs . . . . CUC's membership
> activities are conducted principally through its
> Comp-U-Card division . . . .

(Pls.' 56.1 Stmt., Ex. 1 at CSI/CEN 257168.)  According to

15

Defendant Silverman – who was on the HFS side of the deal – CUC
had reported a 20-30% annual earnings growth in the years prior
to the CUC-HFS merger.  (Silverman Dep. 7:15 - 8:6; Pls.' 56. 1
Stmt., Ex. 3.)  Silverman reported to a major economic news
publication that "Every time I was nervous, [CUC] would show up
with another quarter of spectacular earnings . . . . [CUC] was
producing 20% to 30% growth in a company where nobody worked.
Once you overlaid our standards, we figured this could be a gold
mine."  (Pls.' 56.1 Stmt., Ex. 4 at SAR 05368.)

     CUC touted its use of "cross-marketing" as one of the
reasons for its financial success.  Cross-marketing involved the
marketing of services of one of CUC's service lines to the
existing customers of another service line.  (Thompson Dep. 52:19
- 53:3, at Pls.' 56.1 Stmt., Ex. 29.)  CUC routinely used cross-
marketing to generate business for itself and for companies it
had acquired prior to the CUC-HFS merger.  The success of the
cross-marketing method and CUC's exceptional revenue performance
were significant factors in HFS' decision to merge with CUC.
(Pls.' 56.1 Stmt., Ex. 1 at CSI/CEN 257190; Silverman Dep. 14:8 -
15:18, at Pls.' 56.1 Stmt., Ex. 3.)

     During the due diligence conducted in preparation for the
CUC-HFS merger, Silverman admits to being rebuffed when he asked
for correct financial statements from CUC.  (Silverman Dep. 66:9-

16

68:10, at Pls.' 56.1 Stmt., Ex. 3.)  Silverman did not obtain
complete and accurate financial information from CUC even after
the CUC-HFS merger, as well as into early 1998.[10]  (Pls.' 56.1
Stmt., Ex. 56 at CAA/CSI 00035.)  Cendant was formed in December
1997 when CUC and HFS merged.  (Cendant Form 10K, at Lawler Aff.
of Jan. 30, 2007, Ex. 25 at SAR 14503.)

## D.   Discovery of the CUC Accounting Fraud and Acquisition of Credentials by Cendant

Around the time of the CUC-HFS merger, Defendant Katz called
Counterclaim-Defendant Lincolnshire about the possibility of
Cendant's acquiring Credentials.  (Kumble Dep. 155:14 - 156:23,
at Pls.' 56.1 Stmt., Ex. 15; see also Lawler Aff. of Jan. 30,
2007, Ex. 40.)  Lincolnshire's CEO Steve Kumble has testified
that Katz told him the phone call was being made on Silverman's
behalf.  (Kumble Dep. 8:16-22, at Pls.' 56.1 Stmt., Ex. 15.)
Following that initial conversation, on December 19, 1997,
Lincolnshire sent Katz a letter which forecasted revenues for
Credentials in 2000 of $158 million.  (Lawler Aff. of Jan. 30,
2007, Ex. 38 at CSI/CEN 001035.)  On January 16, 1998,
Credentials sent a proposed Letter of Intent to Cendant, which

---

[10] More details on Silverman's learning of the massive
accounting fraud at CUC is addressed in the following subsection,
infra.

17

set forth a proposed non-binding $175 million purchase price.
(Lawler Aff. of Jan. 30, 2007, Ex. 43; Defs.' 56.1 Stmt. ¶ 63;
Pls.' 56.1 Stmt. ¶ 63.)

Due diligence commenced.  The parties agree that Defendant
Katz — along with Defendant Corigliano, Amy Lipton, and Frank
Murphy — were the main liaisons for Cendant during that period.
(Defs.' 56.1 Stmt. ¶ 59; Pls.' 56.1 Stmt. ¶ 59; Maloney Dep.
236:25 - 237:24, 268:8 - 269:6, at Lawler Aff. of Jan. 30, 2007,
Ex. 10.)  While Silverman was not directly involved with the
negotiations, Katz testified that he had periodic discussions
with Silverman about the progress of the Acquisition negotiations
(Katz Dep. 36: 6-9, at Pls.' 56.1 Stmt., Ex. 23), that he
discussed with Silverman the idea of changing the up-front price
for Credentials from $175 million to $125 million before
proposing that price structure to Sellers[11] (Katz Dep. 37:15-
38:21, at Pls.' 56.1 Stmt., Ex. 23), that he updated Silverman
when the up-front purchase price of Credentials actually changed
(Katz Dep. 37:10-15, at Pls.' 56.1 Stmt., Ex. 23), and that he
advised Silverman about negotiations related to the holdback and
earn-out provisions in the SPA (Katz Dep. 37:10-15, at Pls.' 56.1
Stmt., Ex. 23).  Moreover, Maloney testified that Katz told him

---

[11] The negotiations surrounding the purchase price are
discussed in further detail in this subsection, _infra_.

that he kept Silverman well-apprised of the status of the Acquisition.  (Maloney Dep. 56:13-20, at Pls.' 56.1 Stmt., Ex. 14.)[12]

At the same time due diligence on the Acquisition was beginning, Silverman – along with other officers from the HFS side of Cendant – began to learn that CUC's financial data was not correct.  At a February 1, 1998 Cendant meeting attended by Silverman, Corigliano stated that adjustments would need to be made to the numbers that CUC had previously provided for an earnings release.  (U.S. v. Walter A. Forbes & E. Kirk Shelton, No. 02 Cr. 264 (AWT) (D. Conn.), Trial Transcript, Testimony of Steve Monaco [former CFO of HFS] at 2094:14 - 2095:18; see also Wilkie Farr & Gallagher Memorandum, dated Apr. 23, 1998 at CAA/CSI 03523, at Pls'. 56.1 Stmt., Ex. 53.)  At an Audit meeting on February 3, 1998, Cendant's auditors reported that improper accounting methods had been used by CUC to calculate some of its

_____

[12] There is further evidence of Silverman's pre-Acquisition knowledge about the SPA negotiations, including a press release later drafted by Cendant in which Silverman was quoted as saying: "We are delighted by this opportunity to add [Credentials'] operations and expertise to our own credit-information membership program . . . . By combining [Credentials] with Cendant's own direct marketing prowess, affinity partnerships, and credit-monitoring operations, we will be able to leverage this great service for the benefit of our collective membership base." (Press Release Draft dated Apr. 1, 1998, at Pls.' 56.1 Stmt., Ex. 31.)

1997 earnings.[13]   (Forbes Dep. 56:6-57:18, at Pls.' 56.1 Stmt.,
Ex. 55; see also Wilkie Farr & Gallagher Memorandum, dated Apr.
23, 1998 at CAA/CSI 03524-25, at Pls'. 56.1 Stmt., Ex. 53.)

Around the same time as HFS' revelations about CUC's
earnings misrepresentations, Cendant alleges that it was learning
that "the prospects for [Credentials'] product were less
favorable than the sellers had represented; and therefore, the
values of those cash flows from the relationships and the members
that they had, was substantially less than the value sought by
the sellers."   (Katz Dep. 25:17-23, Lawler Aff. of Jan. 30, 2007,
Ex. 39.)   Defendants, however, have not stated when Sellers made
these purported misrepresentations about Credentials'
performance, but there are no purported misrepresentations on the
record to which Katz could have been referring other than the
December 19, 1997 letter sent to him from Lincolnshire which
estimated, among other things, Credentials' potential revenue in
2000 as $158 million.   (See supra, citing Lawler Aff. of Jan. 30,
2007, Ex. 38 at CSI/CEN 001035.)

---

[13] On February 5, 1998, Silverman proposed a sale of
1,700,000 shares of his Cendant stock for a profit of
$61,420,240.00.  (Pls.' 56.1 Stmt., Ex. 80.)  That sale was
executed the next day for a profit of $60,456,250.00.  (Pls.'
56.1 Stmt., Ex. 80.)  Plaintiffs' proof of this transaction is a
print-out of a Market Watch website.  Defendants do not contest
the truth of this evidence.

In any event, on February 10, 1998, Credentials, CSI, and Cendant executed a revised Letter of Intent.  (Pls.' 56.1 Stmt., Ex. 22.)  That letter set forth an "aggregate purchase price" in the sum of $125 million paid in cash at closing, plus a "contingent payment".  (Id.)  The terms of the contingent payment were defined as follows:

> In the event and to the extent that the new net memberships acquired by [Credentials] for the year ending December 31, 1998 shall exceed one (1) million, then [Cendant] shall pay an additional amount . . . equal to the product of the number of net new memberships acquired for the year ending December 31, 1998 in excess of one (1) million and $25.

(Pls.' 56.1 Stmt., Ex. 22, Schedule A.)  Plaintiff Thompson has testified that, counter to Katz' testimony, Cendant's purported skepticism about Credentials' benchmarks was not the reason that Cendant insisted on the contingent payment clause.  Indeed, Maloney has testified that after February 10, 1998, Defendant Corigliano and Anne Pember "agreed that the membership projections that were prepared by Credentials for fiscal year '98 were reasonable."  (Maloney Dep. 329:22 - 330:12, at Pls.' 56.1 Stmt., Ex. 14.)[14]

_____

[14] Moreover, Maloney testified that Corigliano was never skeptical of Credentials' business, but rather, offended by "the fact that anyone could have a business that did better than his business."  (Maloney Dep. 273:16-21, at Lawler Aff. of Jan. 30, 2007, Ex. 10.) (Thompson Dep. 251:13-20, at Pls.' 56.1 Stmt., Ex.

Silverman has testified that on March 7, 1998, Corigliano admitted to him that CUC's numbers had included at least $100 million in non-recurring income.  (Silverman Dep. 113:8 - 115:18, at Pls.' 56.1 Stmt., Ex. 3.)  An audit report produced by Cendant states that around this time, "Silverman concluded that [CUC's records] clearly demonstrated an intent to use merger reserves to manage earnings and that is not permissible."  (Pls.' 56.1 Stmt., Ex. 56 at CAA/CSI 00037.)

On Sunday, March 8, 1998, at a meeting attended by numerous Cendant officials, including Katz, Silverman discussed what he had learned about CUC.  (Pls.' 56.1 Stmt., Ex. 68 at CAA/CSI 01470; Pls.' 56.1 Stmt., Ex. 56 at CAA/CSI 00038.)  Katz testified that at that meeting: "[t]here was discussion about the two items relative to the historical financial results of CUC in the 1997 period . . . including a number of nonrecurring items of income, and the magnitude of those nonrecurring items."  (Katz Dep. 133:15 - 134:23, at Pls. 56.1 Stmt., Ex. 23.)  Katz also testified that at the meeting there was discussion about "an open adjustment developed in the audit . . . . [and] whether or not that [amount] was a material amount."  (Katz Dep. 134:23 - 135:1, Pls.' 56.1 Stmt., Ex. 23.)  James Buckman, who also attended the

---

29.)

meeting, described some of the discussion at the March 8, 1998

meeting as follows:

> The gist of [the meeting was about how] Scott
> Forbes [former HFS officer[15]] had been up visiting
> the CUC offices meeting with the accounting people
> as well as [former CUC officer] Kirk Shelton
> because Scott was – we were in the throes of
> changing the reporting structure for the financial
> reporting.

> And that he had been approached – Scott had been
> approached by Kirk Shelton at some point suggesting
> to Scott they were planning, "they" meaning the
> people at CUC, the former CUC, were planning on
> utilizing some of the reserves that had been
> established in connection with – I believe our
> merger, but it may have been a prior merger
> reserve, I don't have a recollection of that, to
> utilize them in the ensuing months of that year,
> 1998, to enhance or to include in revenues of the
> company, and he asked Scott to be aware of that and
> to – if he could think of a creative way to do that
> or something to that effect.

> . . . .

> Henry [Silverman] indicated, one, that he was – he
> was very unhappy to hear that . . . they were
> proposing to do that because, you know, best he
> could tell, and as was confirmed by Scott and Mike,
> that would be inappropriate, it would be improper.

> Secondly, that if they need to do that, then what
> in the heck is happening to their businesses up
> there if they're not performing as well as they
> have been projected [sic] to be performing.

> Three, if they got this problem this year, 1998,
> perhaps they've had similar problems in the past,

---

[15] Pls.' 56.1 Stmt. ¶ 115, citing S. Forbes Dep. 17:15-25, at
Pls.' 56.1 Stmt., Ex. 55.

> and he was concerned about that because he didn't
> know the answer to that question, whether or not
> they had those problems and whether or not anything
> improper had been done in those prior years.
>
> Four, . . . that as we had discussed earlier, this
> really caused him to have a real problem with
> Shelton and Corigliano for not having come forward
> earlier to him and said "We have a problem with our
> business."

(Buckman Dep. 115:8 - 116:25, at Pls. 56.1 Stmt., Ex. 59.)

Despite having attended this March 8, 1998 meeting, Katz has

testified that April 13, 1998 – three days after the SPA's

closing – was the first time he recalled hearing about "actual or

potential accounting irregularities on the CUC side of the

Cendant business".   (Katz Dep. 131:2-6, at Lawler Aff. of Jan.

30, 2007, Ex. 39.)

On March 9, 1998, Silverman met with Corigliano and other

Cendant officers – not including Katz – to discuss further the

non-recurring income items in CUC's records.   (Silverman Dep.

141:9 - 149:15, at Pls.' 56.1 Stmt., Ex. 3; Pls.' 56.1 Stmt., Ex.

56, at CAA/CEN 00038.)   According to Cendant's audit reports,

Silverman stated at the meeting that:

> He felt betrayed and deceived because no one at CUC
> had told him that in order to meet their 1998
> numbers the company would have to take $165 million
> of reserves into income.   He felt that he had been
> deceived because CUC was not the business that they
> had been led to believe that it was.   No one had
> told him that 25% of their earning for 1997 were
> non-operating or non-recurring.

24

(Pls.' 56.1 Stmt., Ex. 56, at 00039.)

Throughout the Sellers' and Defendants' negotiations for the Acquisition of Credentials, Defendants never told Sellers about the CUC accounting fraud.  Defendants do not dispute this.[16] Plaintiffs' witnesses also testify that Defendants fraudulently misrepresented their intent to market aggressively Credentials' products, particularly as to their intent to cross-market Credentials' products to Cendant's pre-existing customers.  For example, Maloney stated that Cendant repeatedly assured them that it would use cross-marketing to promote Credentials' products, and that it was committed to increasing Credentials' membership:

> The people at Credentials, Cosmo Corigliano and Sam Katz were the ones, Anne Pember as well, that told me that they would use their muscle and we would far exceed the numbers that we had anticipated in terms of net new members because of the efforts that Cendant would make separate and apart from adding members that Credentials was intending to add to their core membership base.

---

[16] Nor do Defendants dispute that an accounting fraud occurred at CUC.  Indeed, Defendant Corigliano – and other Cendant employees from the CUC side – were ultimately convicted for their crimes relating to the fraud.  (Third Am. Compl. ¶¶ 75-83; Defs.' 56.1 Stmt. ¶¶ 87-89; see generally, United States v. Walter A. Forbes & E. Kirk Shelton, No. 02 Cr. 264 (AWT) (D. Conn.) and United States v. Cosmo Corigliano, No. 00 Cr. 379 (WHW) (D.N.J.).)  The criminal conduct for which these individuals were convicted included artificially inflating CUC's income by $500 million.  (United States v. Forbes & Shelton, No. 02 Cr. 264 (AWT) (D. Conn.); United States v. Corigliano, No. 00 Cr. 379 (WHW) (D.N.J.).)

(Maloney Dep., 48:20-25, at Pls.' 56.1 Stmt., Ex. 14; see also

Maloney Dep., 49:15-23; Thompson Dep. 257:9 - 258:17, at Pls.'

56.1 Stmt., Ex. 29.)  Maloney, as well as Credentials' CFO Allan

Weinstein (Ex. 41, Weinstein Dec. ¶ 1), further testified that

Defendant Katz told them during negotiations that despite any

contingent payment clause, Sellers would "get back what [they]

originally discussed, the [$175 million] IPO price."  (Maloney

Dep. 55:16-17; Weinstein Dep. 260:13-17, at Pls.' 56.1 Stmt., Ex.

19.)  Other parts of Weinstein's deposition testimony further

describe Defendants' representations that they would cross-market

and market aggressively:

> Q    Did anyone from Cendant tell you prior to
>      April 10, 1998, that CUC, as opposed to
>      Cendant, engaged in the practice of cross-
>      marketing during calendar year 1997?
>
> A    Absolutely.  I mean that's how they accrue
>      their member base.
>
> . . . .
>
> Q    Do you know the extent of Cendant's cross-
>      marketing during that period of time?
>
> A    I think that was the whole concept of the
>      reason between the merger between HFS and CUC.
>      Again, these are the guys that developed the
>      new, you know, fast ball, and you know,
>      everyone in the industry was sort of following
>      it and interested in it and this was sort of
>      the new powerful engine in direct marketing.
>
> Q    . . . . Were you ever told anything about
>      which products were being cross-marketed or

26

> how many dollars were being generated by
> cross-marketing during the period of December
> 17, 1997, and April 10, 1998, by Cendant?
>
> . . . .
>
> A    I don't remember any specific information.  It
> was their – the number one thing they talked
> about and everything I saw in connection with
> them.  I mean, it was their business plan, it
> was their engine of growth, it was the most
> important thing to that business, from
> everything that I was able to read and find
> and see.

(Weinstein Dep. 253:7 - 255:2, at Pls.' 56.1 Stmt., Ex. 19.)

Weinstein also has testified as to Cendant's assurances about its

cross-marketing expertise that Cendant said: "'Guys, we know how

to do this, you know, you know how we've grown our membership . .

. . [L]ook how we've grown and we know this business and we have

the marketing muscle necessary to drive the business much better

than you guys . . . .'" (Weinstein Dep. 273:25 - 274:3, 302:4-7,

at Pls.' 56.1 Stmt., Ex. 19.)

    Defendants refute all of Plaintiffs' evidence about

Cendant's assurances, but only by denying in their memoranda that

any of those statements were made, referring to them in their

papers as "alleged oral statements".  (See, e.g., Defs.' Mem. of

Law at 13.)

    To refine Cendant's marketing obligations under the SPA –

particularly in light of the contingent payment clause – the

27

parties drafted a new version of the SPA on March 17, 1998 which

included the following language at Section 5.11:

> Cendant will use reasonable commercial efforts to
> cause the products of [Credentials] to continue to
> be marketed substantially in accordance with the
> general historical practices of Cendant's Comp-U-
> Card division for marketing products similar to
> those offered by [Credentials], it being understood
> that Cendant shall not be deemed to be in breach of
> this [provision] as a result of any change in such
> marketing practices that in Cendant's good faith
> judgment is necessary to comply with applicable law
> or the requirements of third parties under any
> Material Agreement . . . or that is consistent with
> changes in the general marketing practices of the
> industry in which [Credentials] competes.[17]

(Pls.' 56.1 Stmt., Ex. 28, § 5.11.)  Sellers have referenced

testimony by Allan Weinstein which suggests that the parties'

purpose for requiring Cendant to adhere to its "general

historical practices" was to ensure that Cendant cross-marketed

Credentials' products:

> Q    Was there anything in the contingent payment
>      covenants suggested by the sellers that
>      required cross-marketing by Cendant?
>
>      . . . .
>
> A    I think that's what 5.11 was.

(Weinstein Dep. 283:16-22, at Pls.' 56.1 Stmt., Ex. 19.)

According to Maloney:

---

[17] This provision was included in the final version of the
SPA.  (Pls.' 56.1 Stmt., Ex. 26 § 5.11.)

> That was a big part of the negotiation was [sic]
> making sure that we would get our contingent
> earnout and the assurance that Cosmo gave us and
> Sam also did, but primarily Cosmo, was that they
> were going to be able to, quote/unquote, market the
> hell out of the file and cross-market it and that
> we wouldn't have any fears of making our earnout
> and that it would get us back to the IPO price.
>
> Those conversations were kind of continuous because
> as we would change provisions and negotiated the
> earnout and things of that nature, I wanted to get
> assured that we were going to make money on the
> earnout.   Otherwise, I didn't want to sell the
> business.   I didn't want to really sell the
> business at 125.  If I thought all we were going to
> get was 125, I would have just called the sale off.

(Maloney Dep. 320:4-21, Pls.' 56.1 Stmt., Ex. 14.)  Defendants,

without any factual support other than the text of Section 5.1

itself, argue that nothing in Section 5.11 required them to

cross-market Credentials' services with Cendant's.  (Defs.' Mem.

of Law at 15.)

Despite this new SPA provision and despite Defendants'

representations that they would cross-market and market

aggressively Credentials' products, on March 19, 1998, Corigliano

wrote to the Cendant executive committee that he did "not expect

to add members in excess of the contingency level", and that they

added the contingent payment clause because Cendant was "unable

to get comfortable with [Credentials'] 1998 budget."[18]  (Defs.'

_____

[18] Plaintiffs contend that they never received Corigliano's
March 19, 1998 memorandum prior to this litigation.  (Pls.' 56.1

56.1 Stmt., Ex. 49, at CSI/CEN 066158.)

Not only do Defendants dispute in their Memoranda Sellers' reading of Section 5.11, but they also assert that Sellers improperly withheld information from Cendant during the Acquisition negotiations about Credentials' use of one-step telemarketing.  However, due diligence provided Cendant with access to various documents which would have alerted Cendant about Credentials' use of one-step telemarketing.  Lincolnshire Senior Associate Allan Weinstein testified that during due diligence, Cendant was granted access to Credentials' financial records "like any other buyer".  (Weinstein Dep. 218:3-20, 231:2-14, at Counterclaim-Defs.' 56.1 Stmt., Ex. 21.)  In-House Counsel for Cendant Jennifer Taub testified that she received some of Credentials' marketing materials prior to the Acquisition, though she did not recall whether she received Credentials' telemarketing scripts.  (Taub Dep. 7:6-8:12, 26:24-27:21, at Counterclaim-Defs.' 56.1 Stmt., Ex. 47.)

Among the documents to which the parties agree Cendant had access were the Experian Agreement and the Citibank Agreement.  (Counterclaim-Defs.' 56.1 Stmt. ¶ 105; Counterclaim-Pls.' 56.1 Stmt. ¶ 105; Pls.' 56.1 Stmt. on Count Four, Ex. 1.)  Also

---

Stmt. ¶ 70.)

available was an internal memorandum written by a Cendant
employee during due diligence which states: "I assume this is due
to the fact that F[ull]F[illment] contains a credit report.
Doesn't credit report up-front suppress marketing?"
(Counterclaim-Defs.' 56.1 Stmt., Ex. 51, at CSI/CEN 038616.)
Sellers argue that this memorandum is a written memorialization
of Cendant's knowledge of Credentials' use of up-front, "[i.e.,
one-step]", telemarketing (Counterclaim-Defs.' 56.1 Stmt. ¶ 102),
whereas Defendants contend that whether this memorandum refers to
"one-step telemarketing" is merely an "assumption" made by a
person who did not himself write the memorandum (Villano Dep.,
75:22 - 76:2, at Counterclaim-Defs.' 56.1 Stmt., Ex. 52).
Sellers also allegedly gave a PowerPoint presentation to Cendant
in which they stated that Credentials made an "Immediate Delivery
of First Credit Report".  The parties disagree on whether
"Immediate Delivery" is a reference to one-step telemarketing.[19]
(Counterclaim-Defs.' 56.1 Stmt., Ex. 53 at WGM CSI 001519;
Counterclaim-Defs.' 56.1 Stmt. ¶ 104; Counterclaim-Pls.' 56.1
Stmt. ¶ 104.)

    Allan Weinstein has stated in his Declaration that he had

_____

    [19] Defendants do not agree with Sellers that the PowerPoint
presentation was even given to Cendant.  (Counterclaim-Pls.' 56.1
Stmt. ¶ 104.)

personally informed Cendant representatives, including
Corigliano, Anne Pember, and Amy Lipton, about Credentials' use
of one-step telemarketing.  (Weinstein Dec. ¶ 5.)   But when
asked about the Experian Agreement at his deposition, Weinstein
also testified that whether "Credentials was getting written
permission from customers" was "an operational detail that [he]
wouldn't have concerned [himself] with . . . ." (Weinstein Dep.
136:17 - 137:6, at Lawler Aff. of Jan. 30, 2007 of Feb. 28, 2007,
Ex. 55.)  Moreover, according to CUC senior vice president Peter
Wragg, Cendant monitored Credentials' and other competitors'
marketing activities well before Cendant considered acquiring
Credentials, and thus would have been aware of Credentials' use
of one-step telemarketing even before the exchange of due
diligence materials.  (Wragg Dep. 15:16 - 18:10, 61:2 - 65:19, at
Counterclaim-Defs' 56.1, Ex. 9.)[20]

On April 9, 1998 (the day before the Acquisition), Cendant
convened an analyst call.  On the call, Silverman told the market

---

[20] The parties also dispute whether Cendant itself used one-
step telemarketing before the Acquisition.  Sellers set forth
telemarketing scripts used by Cendant which employ the one-step
method (see, e.g., Counterclaim-Defs.' 56.1 Stmt., Ex. 35 at
CSI/CEN 250294); but Cendant submits a deposition from a former
high-level telemarketing executive at Cendant who testified that
the existence of those telemarketing scripts does not mean that
the one-step scripts actually were used (Chalfin Dep. 106:19-
107:3, at Counterclaim-Defs.' 56.1 Stmt., Ex. 36).

that Cendant's "fundamentals [were] great", and that the "financial issues . . . really [were] zero". (Pls.' 56.1 Stmt., Ex. 38 at CAA/CSI 02459.)  He further noted: "[W]here we expect to report earnings next month we would also expect to report a record number of gross ads in the membership business.  So . . . membership has never been better."  (Pls.' 56.1 Stmt., Ex. 38, at CAA/CSI 02465.)  Silverman was asked about this analyst call at his deposition:

> Q   Did you fully disclose to the marketplace, sir, everything you know about CUC and what you learned on March 6 and your feelings that HFS shareholders had gotten a bad deal?  Did you fully disclose that on April 9, 1998?
>
>     . . . .
>
> A   We disclosed what we believed to be appropriate.

(Silverman Dep. 287:12-20, at Pls. 56.1 Stmt., Ex. 3.)

Also on April 9, 1998, Steven Speaks, the controller for Cendant's CUC division, advised Scott Forbes and Steve Monaco (who were Cendant officers formerly of HFS) that CUC's irregular accounting practices produced falsely inflated revenues for CUC. (Pls. 56.1 Stmt., Ex. 74, at ¶4b.)  According to Speaks, the CUC product which benefitted most from the fraudulently reported

revenues was Credentials' competitor, PrivacyGuard.[21]   (Pls. 56.1

Stmt., Ex. 74, at ¶4b.)   After the analyst call, Scott Forbes

informed Silverman what he had learned from Speaks.   (S. Forbes

Dep. 195:18 - 196:6, 198:4-25.) Pls.' 56.1 Stmt., Ex. 55.)


**E.   The Stock Purchase Agreement**

   Sellers and Cendant executed the SPA on April 10, 1998.

(Lawler Aff. of Jan. 30, 2007, Ex. 54; Counterclaim Defs.' 56.1

Stmt., Ex. 1.)   It provided for the sale of Credentials' stock to

Cendant.   The final purchase price provision provided as follows:

> The purchase price for the Shares (the "Purchase
> Price") shall consist of (i) an aggregate amount
> (the "Closing Date Purchase Price") equal to (x)
> $125,000,000 <u>less</u> (y) the sum of (A) the amount of
> Indebtedness outstanding immediately prior to the
> Closing (B) $146,291.64 (which the parties agree
> represents the aggregate amount of all Excess
> Severance Obligations the amount of which is known
> by [Credentials] as of the Closing Date) <u>plus</u>
> (C)(1) $425,000 (which the parties agree represents
> the aggregate amount of the settlement payment made
> by [Credentials] on March 26, 1998 pursuant to the
> Richards Settlement Agreement) and (2) $2,000,000
> (which the parties agree represents the amount of
> the settlement payments being made by [Credentials]
> on the date hereof pursuant to the Ferry Settlement
> Agreements) <u>plus</u> (D) $600,000 (which amount
> represents 50% of the fees and expenses described
> in Section 3.1(o) of the <u>Disclosure Schedule</u>, and

---

[21] **PrivacyGuard was a Cendant entity which, like Credentials,
furnished credit reports and credit monitoring services for its
customers.   (See supra, citing Cendant Form 10K at SAR 14526, at
Lawler Aff. of Jan. 30, 2007, Ex. 25.)**

> (ii) the Contingent Payment, if any, payable as provided in Section 2.1(d). The Closing Date Purchase Price shall be subject to post-Closing adjustment as provided in Section 2.2 and shall be payable as provided in Section 2.1(c).

(Counterclaim-Defs.' 56.1 Stmt., Ex. 1 ("SPA"), § 2.1(b) (emphasis supplied).) Section 2.1(d) prescribed the following for an additional contingent payment:

> If and to the extent that the aggregate number of Net New Memberships exceeds the Membership Threshold Amount, then Cendant shall pay to the Sellers in accordance with this Section 2.1(d) an additional amount (the "Contingent Payment") equal to the excess, if any, of (A) the product of (i) the number of Net New Memberships in excess of the Membership Threshold Amount multiplied by (ii) twenty-five dollars ($25) minus (B) the product of Net New Memberships added by [Credentials pursuant to a provision in its October 29, 1997 Agreement with Citibank (South Dakota), N.A., at Counterclaim-Defs.' 56.1 Stmt., Ex. 49, § 5.1(f)] multiplied by (ii) twelve dollars ($12). Promptly following March 31, 1999, [Credentials] shall deliver to the Sellers' Representative a certificate signed by a duly authorized officer of [Credentials] setting forth the number of new one-year and separately multi-year memberships added by [Credentials] during each month of the 1998 calendar year . . . . Promptly following each calendar quarter during the calendar year ending December 31, 1999 and the calendar quarter ending March 31, 2000, [Credentials] shall deliver to the Sellers' Representative a certificate signed by a duly authorized officer of [Credentials] setting forth the number of Net New Memberships . . . as of the last day of such immediately preceding calendar quarter and the Contingent Payment, if any, payable by Cendant with respect to such calendar quarter, calculated in accordance with Section 2.1(d)(iii) below . . . .

(SPA, § 2.1(d).)  The contingent payment was in part dependent on the efforts Cendant took to market Credentials' products, which Section 5.11 of the SPA required to be "reasonable commercial efforts . . . in accordance with the general historical practices of [CUC]."  (See SPA, § 5.11, quoted at Section I(D), supra.)

The SPA also contained twenty-two pages of warranties and representations (SPA, §§ 3.1, 3.2, & 3.3).  According to the SPA, "[t]he obligations of Cendant to consummate the Acquisition and other transactions contemplated by [the SPA]" were subject to the satisfaction at or prior to the Closing of the representations and warranties.  (SPA, § 6.2.)  Among the warranties was Credentials' representation to Cendant that it "is, and has been, in compliance in all material respects with all applicable laws".  (SPA, § 3.1(f)(i).)  Credentials also warranted that it:

> is not and, to the knowledge of [Credentials] no other party is, in default in any material respect under any such agreement, commitment arrangement, lease, insurance policy or other instrument, whether entered into in the ordinary course of business or otherwise and whether written or oral and there has not occurred any event that, with the giving of notice or the lapse of time or both, would constitute such a default.

(SPA, § 3.1(p).)  The parties agree that the Experian Agreement was among those referenced in the Section 3.1(p) warranty.

The SPA further provided for Cendant to retain a Holdback Amount of $16,200,000.00 from the initial $125,000,000.00

purchase price.  (SPA, § 2.3(c).)  The Holdback Amount was
insurance against some of Credentials' potential liabilities.
One such potential liability was Credentials' responsibility to
compensate Citibank for any amount of commissions less than
$9,000,000.00 owed under Section 5.1(b) of the Citibank
Agreement.  See Section I(B), supra.  To that end, the SPA
fashioned a schedule by which Cendant would pay Sellers portions
of the Holdback Amount in the amounts of: (1) $3,500,000.00
within ten business days of February 15, 1999, and (2)
$3,200,000.00 within ten business days of March 31, 1999,
provided that, at the time each of these two payments was due,
the commissions paid to Citibank under the Citibank Agreement had
equaled or exceeded $9,000,000.00.  (SPA, § 2.3(c).)
Specifically, the SPA provided that:

> Within ten (10) Business Days following (x) the
> earliest of (i) February 15, 1999, (ii) the date on
> which the aggregate amount of all commission
> payments made by [Credentials] to Citibank from
> October 29, 1997 through December 31, 1998 pursuant
> to the Citibank Agreement exceeds $11,000,000 (iii)
> December 31, 1998 if, on such date, the amount of
> commission payments made by [Credentials] from
> October 29, 1997 throught December 31, 1998,
> together with commission payments owed but not yet
> paid to Citibank for such period, equal or exceed
> $9,000,000, Cendant shall pay to [Sellers] . . . an
> aggregate amount equal to the amount, if any, by
> which the amount required to be paid by Sellers
> pursuant to . . . [the Citibank Agreement] as of
> December 31, 1998 is less than $3,500,000, and (y)
> March 31, 1999, Cendant shall pay to [Sellers] an

37

> aggregate amount equal to the amount, if any, by
> which the amount required to be paid by Sellers
> pursuant to . . . [the Citibank Agreement] as of
> December 31, 1998 is less than $3,200,000 . . . .

(SPA, § 2.3(c).)

An additional $2,000,000.00 portion of the Holdback Amount

was reserved for potential liabilities under other sections of

the SPA, namely, Sections 8.1(a)(i), 8.1 (a)(ii), 8.1(a)(iv),

8.1(b)(i), and 8.1(b)(ii) of the SPA:

> Within ten (10) Business Days following the later
> of (i) September 10, 1999 and (ii) the date that is
> ninety (90) days after the Final Disposition Date,
> Cendant shall pay to the Sellers . . . an aggregate
> amount required to be paid by [Sellers] pursuant to
> . . . Sections 8.1(a)(i), 8.1 (a)(ii), 8.1(a)(iv),
> 8.1(b)(i), and 8.1(b)(ii) of [the SPA] to such date
> less than $2,000,000.

(SPA, § 2.3(d).)  Sections 8.1(a)(i), 8.1 (a)(ii), 8.1(a)(iv),

8.1(b)(i), and 8.1(b)(ii) of the SPA contained, in relevant part,

Sellers' promise that they would jointly and severally indemnify

and hold harmless Cendant and Credentials against any losses

resulting from, arising out of, or based upon any failure by

Credentials or Sellers to perform any of their covenants or

obligations to be performed on or prior to the Closing Date.

(SPA, §§ 8.1(a)(I) & 8.1(b)(i).)

The parties further agreed to a clause providing that

indemnification would be the "sole remedy for any claim for

monetary damages arising out of or relating to [the SPA] or the

transactions contemplated hereby, other than any claim based upon or arising out of the fraud of any party hereto." (SPA, § 8.6.) Under the "sole remedy" provision, Cendant also agreed that it would "not seek indemnification payments directly from any of the Sellers except to the extent that the Holdback Amount has been (or would be as a result of any indemnification hereunder) reduced to zero . . . ." (SPA, § 8.6.)

The SPA also included a merger clause, which stated:

This Agreement (including the documents and the instruments referred to herein), and any other agreement among the parties entered into contemporaneously herewith, constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof. This Agreement may be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

(SPA, § 9.5.) Cendant and Sellers further agreed that the SPA would be "governed by and construed in accordance with the laws of the State of New York, without regard to the principles of conflicts of laws thereof". (SPA, § 9.6.)


F.   Credentials After The Acquisition

Sellers have submitted evidence that after the Acquisition Cendant never cross-marketed or marketed aggressively

Credentials' membership services.  For example, Peter Wragg, who was in charge of Credentials' services after the Acquisition, was asked at his deposition:

> Q   . . . . And just to clarify, what we're talking about right now is a list of names essentially owned by Cendant to which it can market whatever service it deems appropriate?
>
> . . . .
>
> A   That seems fair.
>
> Q   Do you know whether Cendant did in fact market Credentials to any of the names we just talked about?
>
> A   I don't remember.
>
> Q   Who in your opinion would know the answer to that question?
>
> A   If you hadn't asked who I could remember, I would have said me.

(Wragg Dep. 129:12-25, at Pls.' 56.1 Stmt., Ex. 89.)

Cendant documents corroborate this point.  An internal Cendant record lists various Cendant divisions which were cross-marketed with one another following the Acquisition, but Credentials was not among them.  (Pls.' 56.1 Stmt., Ex. 90; Melchionno Dep. 211:17 - 215:2, at Pls.' 56.1 Stmt., Ex. 91.) Other Cendant documents show that in June 9, 1998, Cendant had cut back, or was planning to cut back, on various marketing campaigns of Credentials' services.  (Pls.' 56.1 Stmt., Ex. 92,

at CSI/CEN 252317.)  For example, at that time, Cendant decided to market Credentials' services to 50,000 PNC customers instead of 200,000, to 100,000 GE Capital customers instead of 1,000,000, to 100,000 Mercantile customers instead of 250,000, and to 350,000 Wachovia customers instead of 600,000.  (Pls.' 56.1 Stmt., Ex. 92, at CSI/CEN 252317; Melchionno Dep. 125:4 - 131:18, 135:23 - 137:9, at Pls.' 56.1 Stmt., Ex. 91.)

In July of 1998, Cendant conducted marketing trials which tested a telemarketing script used by Credentials prior to the Acquisition ("Credentials Control") against two scripts created by Cendant.  (Counterclaim-Defs.' 56.1 Stmt, Ex. 61, Ex. 62.) The Cendant scripts were each known as "Cendant Legal".  One "Cendant Legal" test script bore the code 6200003CIT; the other bore the code 6200004CIT.  (Counterclaim-Defs.' 56.1 Stmt, Ex. 61, Ex. 62.)  The Credentials Control script and 6200003CIT offered a membership for $49; 6200004CIT offered a membership for $98.  (Counterclaim-Defs.' 56.1 Stmt., Ex. 61, Ex. 62.)  The Credentials Control script garnered 1.73 sales per hour; 6200003CIT garnered 1.59 sales per hour; 6200004CIT garnered 1.52 sales per hour.  (Counterclaim-Defs.' 56.1 Stmt, Ex. 61, Ex. 62.) The Credentials Control script and 6200004CIT used one-step telemarketing.  (Counterclaim-Defs.' 56.1 Stmt. ¶ 135; Counterclaim-Defs.' 56.1 Stmt., Ex. 5.)  6200003CIT, however, was

not produced by Cendant during discovery.  (Counterclaim-Defs.'
56.1 Stmt. ¶ 148.)  But not only is there no affirmative proof
that 6200003CIT was a two-step telemarketing script, there also
is an internal Cendant memorandum to Silverman stating that "a
portion of Citibank marketing", i.e., scripts with "CIT" in the
code, were not changed to two-step telemarketing until September
1, 1998."  (Counterclaim-Defs.' 56.1 Stmt., Ex. 38.)  Cendant
employee Elizabeth Sheehan also testified that all one-step
telemarketing was halted at Cendant after the Acquisition, except
as to Citibank customers.  (Sheehan Dep. 36:19 - 38:13, at
Counterclaim-Defs.' 56.1 Stmt., Ex. 10.)

On August 27, 1998, Cendant sent Sellers notice of a class
action lawsuit filed on June 15, 1998 in the Northern District of
Illinois against Credentials.  (See Frerichs v. Credentials
Services International, Inc., No. 98 Civ 3684 (JBG) (N.D. Ill.
1998), Compl., at Pls.' 56.1 Stmt. on Count Four, Ex. 7.)  The
plaintiffs in that lawsuit alleged that Credentials violated the
Fair Credit Reporting Act by failing to get their written
authorization before obtaining and sending them their credit
reports.  (See Frerichs Compl., at Pls.' 56.1 Stmt., Ex. 7).
Cendant defended Credentials in the Frerichs lawsuit (see
Frerichs Answer, at Pls.' 56.1 Stmt. on Count Four, Ex. 12), and
sought indemnification from Sellers pursuant to the

42

"indemnification as sole remedy" clause of the SPA.   (Pls.' 56.1

Stmt. on Count Four, Ex. 7.)[22]

_____

[22] A settlement of the <u>Frerichs</u> suit was reached and approved
(Pls.' 56.1 Stmt. on Count Four ¶ 25), though the parties do not
include in their summary judgment papers any court documentation
of the settlement approval itself (<u>but see</u> Memorandum In Support
Of Joint Motion For Final Approval Of Class Action Settlement, at
Pls.' 56.1 Stmt. on Count Four, Ex. 13).  However, at a February
6, 2003 hearing, the parties addressed the settlement with the
Court:

| | |
|---|---|
| THE COURT | And how much did [the <u>Frerichs</u> suit] cost you? |
| MR. LAWLER [DEFS.' COUNSEL] | Your Honor I'm not — we were not involved in that lawsuit, and I'm not sure. |
| MR. O'SHEA [PLS.' COUNSEL] | If I may, your Honor, it was near 100,000, thereabouts. |
| MR. LAWLER | A hundred thousand. |
| MR. O'SHEA | It was a small amount. |
| MR. LAWLER | We were pleased to settle it for as little as we did, but the exact amount of the settlement I have told [sic] it, but I just forget how much it was right now. |
| THE COURT | I'm trying to get some sort of sense. |
| MR. LAWLER | I'm thinking it was in the millions of dollars. |
| MR. PETRELLA [PLS.' COUNSEL] | No. |
| THE COURT | I would like actually to have some sense of it, |

On September 23, 1998, Cendant executed on Credentials'
behalf an amendment to the Citibank Agreement.  That amendment
provided that Credentials "shall mail three million Direct Mail
solicitations to [Citibank] cardholders in October 1998, rather
than the nine million pieces originally scheduled, and . . . the
November 1998 insert originally scheduled shall be canceled, and
[Credentials] shall not be obligated to market through such
insert or to pay the related insert fee."  (Pls.' 56.1 Stmt., Ex.
97.)

By the end of 1998, Cendant was compiling data on its

---

                                                because if it's a hundred
thousand, that's one thing,
if it's closer to a hundred
million, that's something
else.

MR. LAWLER                    I don't think it was a
hundred million, but I don't
remember.

MR. PETRELLA                  Your Honor, it was certainly
below one million dollars.
It was in the hundred
thousands.  It was probably
one, two, three, tops.

(Tr., Feb. 6, 2003 4:4-25.)
        On May 9, 2006, this Court so ordered a Stipulation whereby
Defendants "waive[d], relinquish[ed], and forever release[d]"
Sellers "from any liability whatsoever for any damages, costs, or
expenses of any kind that in any way arise out of or relate to
the [Frerichs case]."  (See Stipulation, at Doc. 123, No. 00 Civ.
1422 (DAB), and at Pls.' 56.1 Stmt. on Count Four, Ex. 20.)

44

marketing efforts for Credentials and PrivacyGuard.  According to
a chart produced by Cendant, 256,778 customers joined Credentials
in May of 1998; 269,250 customers joined Credentials in June of
1998; 154,028 in July of 1998; 83,651 in August of 1998; 178,090
in September of 1998; 57,933 in October of 1998; 45,611 in
November of 1998; and 630 in December of 1998.  (Pls.' 56.1
Stmt., Ex. 98, at 007657.)  In January of 1999, zero customers
joined Credentials.  (Pls.' 56.1 Stmt., Ex. 98, at 007657.)  As
for PrivacyGuard, 569,746 new customers joined in March of 1998;
474,684 new customers joined in April of 1998; 419,226 in May of
1998; 311,818 in June of 1998; 302,954 in July of 1998; 347,959
in August of 1998; 312,676 in September of 1998; 323,313 in
October of 1998; 341,596 in November of 1998; and 408,059 in
December of 1998.  (Pls.' 56.1 Stmt., Ex. 98, at 007657.)
Defendants also have submitted an Officers' Certificate – with no
contemporaneous corroborating materials – which states that
Cendant added 1,002,978 gross new one-year Credentials
memberships and 295,066 gross multi-year memberships between
April and December of 1998.  (Lawler Aff. of Jan. 30, 2007, Ex.
55.)  Plaintiffs not only dispute the accuracy and admissibility
of the Officers' Certificate (Pls.' 56.1 Stmt., ¶ 86), but they
also contend that the approximately 58,000,000 potential
customers it added through various marketing strategies and

agreements in 1997 alone (see Pls.' 56.1 Stmt., Ex. 17, at
WGM/CSI 001524-25), in addition to Cendant's own very large pool
of potential customers, belies any argument by Defendants that
the number of new Credentials customers Cendant alleges to have
recruited was favorable.  This is especially so, in light of the
557,000 new members Sellers added to Credentials' membership base
during the year prior to the Acquisition.  (See Defs.' 56.1 Stmt.
¶ 86; Pls.' 56.1 Stmt., ¶ 56.)

     Between January and March of 1999, Cendant began to convert
Credentials' membership data into Cendant's own electronic
database.  (Pls.' 56.1 Stmt. on Count Four, ¶ 49.)  Sellers
contend that these efforts resulted in "a substantial amount of
confusion and turmoil", including data errors and tracking
problems.  (Pls.' 56.1 Stmt. on Count Four, ¶ 49, citing Pls.'
56.1 Stmt. on Count Four, Exs. 28-35.)  Two of Cendant's
witnesses testified that the pre-conversion data maintenance
system was "shut down" and "turned off" after the conversion.
(Hilinski Dep. 118:7-24, at Pls.' 56.1 Stmt. on Count Four, Ex.
25; Willey Dep. 66:22-67:3, at Pls.' 56.1 Stmt. on Count Four,
Ex. 24.)  Gregory Hilinski also testified about the data
conversion: "I don't remember if there was anything that was
really lost or not, no."  (Hilinski Dep. 148:5-6, at Pls. C4 56.1
Stmt., Ex. 25.)  However, Cendant itself admitted, after being

ordered by Judge Eaton to serve "all financial statements and
reports of any kind concerning Credentials for the years 1998
through 2000" (Doc. 94, Memorandum & Order, at Pls. C4 56.1
Stmt., Ex. 37 at 2), that "[r]evenue based information for 1997
and 1998 has not been found" (Defendant's Amended Responses to
Plaintiffs' Interrogatories 7 & 8 Contained in the Second Set of
Document Requests and Interrogatories, at Pls.' 56.1 Stmt. on
Count Four, Ex. 38).

On March 1, 1999, Cendant furnished for Sellers an Officer's
Certificate which stated its calculation for the amount of
Citibank-related holdback payment owed to Sellers under the first
tranche of Section 2.3(c).  According to Cendant, commissions
paid to Citibank as a result of Credentials' marketing efforts to
Citibank customers had amounted to $8,437,824.00.  (Pls.' 56.1
Stmt. on Count Four, Ex. 4.)  That amount was $562,176.00 less
than the $9,000,000.00 in commissions that Credentials promised
Citibank in the Citibank Agreement.  After including 7% interest
as required by the SPA, Cendant determined that the first tranche
of the Section 2.3(c) Holdback Amount owed to Sellers was
$3,120,935.00.  (Pls.' 56.1 Stmt. on Count Four, Ex. 4.)  On or
about March 1, 1999, Cendant paid Sellers $3,120,935.00.  (Pls.'
56.1 Stmt. on Count Four ¶ 13; Pls.' 56.1 Stmt. on Count Four,
Ex. 4; Defs.' C4 56.1 Stmt. ¶ 13.)

On April 14, 1999, Cendant informed Sellers that it would not release the $3,200,000.00 due under the second Section 2.3(c) tranche of the Holdback Amount, citing the liability Credentials might incur from the Frerichs lawsuit as the reason for its withholding payment. (Pls.' 56.1 Stmt. on Count Four, Ex. 15.) In that same letter, Cendant renewed its request for indemnification for any Frerichs liability. (Pls.' 56.1 Stmt. on Count Four, Ex. 15.)

On May 7, 1999, Sellers sent a letter to Cendant asserting that they believed Cendant's March 1, 1999 calculation of the first Section 2.3(c) tranche of the Holdback Amount was "incomplete". In that letter, Sellers requested more information from Cendant to corroborate its computation. (Pls.' 56.1 Stmt. on Count Four, Ex. 5.) Sellers allege that Cendant never responded to their letter (Pls.' 56.1 Stmt. on Count Four ¶ 17), whereas Defendants contest the truth of that allegation but provide no evidence that Cendant actually did respond to Sellers' letter (Defs.' C4 56.1 Stmt. ¶ 17). To corroborate their concerns, Sellers have submitted internal records from Citibank, including a table labeled "Net Revenue 1998 Forecast @ FYF12", which they say indicate that Citibank received $9,697,970.00 in commissions. (See Ex. A of Pearson Decl., at Pls.' 56.1 Stmt. on Count Four, Ex. 6; Pearson Decl. ¶ 6, at Pls.' 56.1 Stmt. on

Count Four, Ex. 6; T. Katz Dep. 149:15 - 151:11, at Pls.' 56.1

Stmt., Ex. 47.)   According to these Citibank records, Sellers

contend Cendant owes them the balance of the first $3,500,000.00

tranche, which, after adding the interest required under the SPA,

equals $562,176.00.[23]

On May 10, 1999, Cendant provided Sellers with a Contingent

Payment Certificate which, according to Defendants, reflected

that the Net New Memberships for the preceding quarter had been

662,163.  (Defs.' 56.1 Stmt, Ex. 55.)   The Membership Threshold

was 830,316, and therefore, according to Defendants, Cendant did

not owe Sellers any contingent payments.  (Pls.' 56.1 Stmt., Ex.

55.)

On September 1, 1999, Sellers sent a letter to Cendant

asserting their position that Cendant's withholding of the second

Section 2.3(c) tranche of the Holdback Amount was improper.

(Pls.' 56.1 Stmt. on Count Four, Ex. 16.)   Cendant responded the

next day, asserting that it was withholding all pending holdback

payments until the resolution of the Frerichs litigation.  (Pls.'

56.1 Stmt. on Count Four, Ex. 17.)   To date, Cendant has not made

any payment pursuant to the second Section 2.3(c) tranche, nor

---

[23] According to the SPA, Cendant was obligated to add seven
percent per annum interest to Section 2.3(c) payments paid in due
course.

has it paid the $2,000,000.00 listed in Section 2.3(d). (Pls.'
56.1 Stmt. on Count Four ¶¶ 39, 40; Defs.' C4 56.1 Stmt. ¶¶ 39,
40.)  Defendants argue that Cendant's counterclaims now pending
before this Court are reason enough to retain the remaining
Section 2.3(c) and Section 2.3(d) tranches.

G.    Procedural History

        Sellers filed this suit on February 24, 2000, seeking to
recover, inter alia, the amounts they allege they are owed in
holdback payments and contingent payments.  Cendant filed a
Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules
of Civil Procedure on July 17, 2000, and the Court subsequently
dismissed Sellers' claims against Cendant but granted leave to
amend them.[24]  (Order Adopting Report & Recommendation, Mar. 30,
2001.)  Sellers subsequently filed an Amended Complaint on April
18, 2001.  Cendant, Silverman, and Katz filed a combined Motion
to Dismiss the Amended Complaint pursuant to Rules 9(b) and
12(b)(6) of the Federal Rules of Civil Procedure, and Corigliano
separately filed his own Motion to Dismiss pursuant to Rules 9(b)
and 12(b)(6).  On those Motions, the Court dismissed Sellers'

---

[24] The Court also granted then-Defendant Amy Lipton's Motion
to Dismiss without leave to amend.  (Order Adopting Report &
Recommendation, March 30, 2001.)

First Claim as against Silverman and Katz, and Sellers' Eighth

Claim as against Corigliano.  (Order Adopting Report &

Recommendation, May 21, 2002.)  The Court denied Defendants'

Motions in all other respects.  (Id.)

Sellers filed a Second Amended Complaint on May 30, 2002.

Cendant filed its Answer and Counterclaims on June 25, 2002;

Corigliano filed his Answer on June 26, 2002; and Silverman and

Katz filed their Answers on November 15, 2002.  On February 6,

2003, the Court held a conference in which the parties' proposed

Confidentiality Order, among other things, was discussed.  (Tr.

15:4-20:9, dated Feb. 6, 2003.)  At that hearing, Plaintiffs'

Counsel also stated that Defendants had objected to all 144 of

Plaintiffs' document requests that had been made before that

date.  (Tr. 23:1-7, dated Feb. 6, 2003.)  The Court addressed

certain of these objections, including Defendants' objections to

Plaintiffs' requests related to a particular telephone call:

> MR. O'SHEA[25]   Request No. 7 is all documents
>                  memorializing the stages of Henry
>                  Silverman during the April 1998
>                  conference call central to our case.
>                  It's met with objection; overbroad,
>                  relevance and vagueness.
>
> THE COURT        You are asking for all documents
>                  related to one telephone call.

---

[25] **Mr. O'Shea represented Plaintiffs at the February 5, 2003
hearing; Mr. Lawler represented Defendants.**

MR. O'SHEA          One    telephone    call,    and all
                    documents  related  to,  and  it's
                    overbroad, irrelevant, and vague.

THE COURT           Mr. Lawler, why is that difficult?

MR. LAWLER          Well,  I  don't  know  that  that is
                    difficult.  In fact, the request was
                    not    exactly    the    way    it   was
                    proscribed   [sic],   because   the
                    conference   call   referenced   in
                    paragraph  61,  and  there  is  no
                    conference   call   referenced   in
                    paragraph  61  of  their  amended
                    complaint, but—

MR. O'SHEA          It's in 69, Judge, it's a typo.

THE COURT           Listen,   you   know something,
                    everybody   is   overwhelmed   and
                    drowning  in  paper.    There  are
                    occasional typos and all of that . .
                    . . So I don't care if there was a
                    typo.  If the way Mr. O'Shea has
                    framed what it is they are looking
                    for today before me is good, then I
                    want to know from you, Mr. Lawler,
                    what the difficulty would be?

(Tr. 25:24 - 26:23, dated Feb. 6, 2003.)

On February 7, 2003, the Court so ordered a Stipulation by
the parties which discontinued Plaintiffs' claims against then-
Defendants John Does # 1-100.  (Stipulation of Discontinuance,
Feb. 7, 2003.)  Discovery proceeded, and on January 19, 2005, the
Court held another conference at which further discovery disputes
were addressed.  At that conference, the Court strongly
admonished Defendants for not "answer[ing] the interrogatories as

52

specifically and fully" as they could.  (Tr. 35:11-12, dated Jan.

19, 2005.)  A third conference was held on July 7, 2005, during

which the Court again expressed its concern with the parties'

inability to reach discovery resolutions on their own:

> You know, I have this deja vu sense about this
> case.  Every time we get together, you know, it
> seems like we haven't moved very far from the last
> time that we got together, and I do specifically
> recall that in January, when we got together, my
> expectation was that things were going to be moving
> along and that discovery issues were going to be
> resolved amicably among you . . . . And, indeed,
> the February 15th letter that I did get suggested
> that things were moving along, as I had hoped from
> Mr. Lawler.

> So you can imagine my surprise when I get these
> letters on June 16th and June 22nd talking about
> discovery issues still.   What do I need to do?
> What do I need to do here?  Please, you're both
> going to get to speak.  I don't care who speaks
> first, but really.

(Tr. 2:6-19, dated Jul. 7, 2005.)

On August 9, 2005, the case was referred to Magistrate Judge

Douglas F. Eaton for general pre-trial supervision.  (Order, Aug.

9, 2005.)  There were at least twelve Orders by Magistrate Judge

Eaton resolving various discovery disputes between the parties.

(See Orders of Magistrate Judge Eaton, dated Nov. 16, 2005, Nov.

29, 2005, Jan. 18, 2006, Feb. 21, 2006, Feb. 23, 2006 (Doc. #104

on the docket), Feb. 23, 2006 (Doc. #105 on the docket), Mar. 13,

2006, Mar. 17, 2006, May 17, 2006, May 22, 2006, May 31, 2006,

and Jun. 16, 2006.)

After being granted leave to do so, Sellers filed their Third Amended Complaint on April 18, 2006.  On August 9, 2006, Defendants sought leave both to file an Amended Answer and to file a Motion for Summary Judgment.  On August 22, 2006, the Court denied Defendants' request to move for summary judgment, concluding that "there is no reasonable view of the record which would warrant summary judgment for Defendants."  (Order, dated Aug. 22, 2006.)  Defendants moved the Court to reconsider its August 22, 2006 Order, but the Court denied that request, stating that: "A summary judgment motion at this stage of the proceedings is a dilatory tactic only."  (Memo-Endorsed, dated October 4, 2006.)  Cendant, Silverman, and Katz were, however, granted leave to amend partially their Answers, and did so on September 29, 2006.

On October 19, 2006, Defendants filed a Petition for a Writ of Mandamus before the Second Circuit.  In that Petition, they sought an Order from the Second Circuit which would require the District Court to permit Defendants to file their Motion for Summary Judgment and which would reassign the case to a different District Court Judge.  On December 12, 2006, the Second Circuit instructed this Court to allow Defendants to file their summary judgment motion, but denied Defendants' request for reassignment

of the case to another judge.  (Order, No. 06-4844-op (2d Cir.),
dated Dec. 12, 2006.)

The parties first submitted their papers on the present
Motions to Chambers before filing them with the Clerk of Court.
Defendants moved to strike: (1) Plaintiffs' Statements pursuant
to Local Civil Rule 56.1, (2) the Declaration of Allan Weinstein
in Support of Plaintiffs' Motion for Summary Judgment, (3) the
Declaration of Michael E. Petrella in Support of Plaintiffs'
Motion for Sanctions for Pervasive Discovery Abuse and Spoliation
of Evidence, and (4) the Reply Declaration of Michael E. Petrella
in Support of Plaintiffs' Motion for Sanctions for Pervasive
Discovery Abuse and Spoliation of Evidence.  The Court denied
Defendants' Motions to Strike in all respects.  (Order, May 4,
2007.)  Defendants also requested that the Court permit them to
file their papers under seal.  The Court denied this request, but
required the parties to redact partially their papers before
filing them.  (Order, May 30, 2007.)

The papers for the Motions now before this Court were filed
formally with the Clerk of Court on June 7 and 8, 2007.

## II. DISCUSSION

**A.    Legal Standard for Summary Judgment**

A district court should grant summary judgment when there is "no genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000).  Genuine issues of material fact cannot be created by mere conclusory allegations; summary judgment is appropriate only when, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party."  Heublein v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993) (citing Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

In assessing when summary judgment should be granted, "there must be more than a 'scintilla of evidence' in the non-movant's favor; there must be evidence upon which a fact-finder could reasonably find for the non-movant."  Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  While a court must always "resolv[e] ambiguities and draw[ ] reasonable inferences against the moving party," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986) (citing Anderson), the non-movant may not rely upon "mere

speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." <u>Id.</u> at 12.  Instead, when the moving party has documented particular facts in the record, "the opposing party must 'set forth specific facts showing that there is a genuine issue for trial.'"  <u>Williams v. Smith</u>, 781 F.2d 319, 323 (2d Cir. 1986) (<u>quoting</u> Fed. R. Civ. P. 56(e)).  Establishing such facts requires going beyond the allegations of the pleadings, as the moment has arrived "'to put up or shut up.'"  <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).  Unsupported allegations in the pleadings thus cannot create a material issue of fact.  <u>Id.</u>

B.   <u>Cendant's Motion for Summary Judgment on Counts One, Two, Three, Four, Six, Seven, and Eight; and Plaintiffs' Motion for Summary Judgment on Count Four</u>

   (1)   <u>Sellers' First Breach of Contract Claim (Count Three): Contingent Payment Plan</u>

   Cendant argues that summary judgment should be granted in its favor on Sellers' first breach of contract claim (Count Three) because there is no evidence that the SPA contained any promise to cross-market or market aggressively Credentials' services.  Sellers disagree.

   Sellers' Count Three breach of contract claim alleges that Cendant violated Section 5.11 of the SPA by failing to market

57

Credentials using "reasonable commercial efforts" in accordance with its "general historical practices". (Third Am. Comp. ¶¶ 142-49; SPA § 5.11.) Cendant argues that Section 5.11 did not oblige it to cross-market or market aggressively Credentials' products, but that even if Section 5.11 did so oblige it, Sellers cannot recover for breach of contract because they themselves breached their SPA "compliance with law" warranties by using one-step telemarketing in purported violation of the Fair Credit Reporting Act ("FCRA") and the Experian Agreement. Sellers counter-argue that: (1) Credentials' use of one-step telemarketing did not materially violate the law or the Experian Agreement; (2) even had Sellers violated their warranties, such violations were neither material to the SPA nor undisclosed to Cendant; and (3) in any event, Cendant is estopped from asserting that Sellers breached the SPA because it sought indemnification for Sellers' purported breach, thereby affirming the continuation of the contract.

"Contract remedies exist to give injured parties the benefit of their bargain." <u>Capital Nat. Bank of New York v. McDonald's Corp.</u>, 625 F. Supp. 874, 883 (S.D.N.Y. 1986) (<u>citing</u> <u>County of Suffolk v. Long Island Lighting Co.</u>, 728 F.2d 52, 63 (2d Cir. 1984). <u>See also</u> <u>Clalit Health Services v. Israel Humanitarian Foundation</u>, No. 02 Civ. 6552, 2003 WL 22251329, at *3 (S.D.N.Y.

Sep. 30, 2003); International Customs Associates, Inc. v. Ford
Motor Co., 893 F. Supp. 1251, 1255-56 (S.D.N.Y. 1995).  Only
parties to a contract have standing to assert a claim for breach
of contract.  See Clalit, 2003 WL 22251329, at *3.  Without a
contractual relationship, there cannot be a contractual remedy.
Capital Nat. Bank of New York, 625 F. Supp. at 883.

   To state a claim for breach of contract in New York, a
claimant must allege:  (1) the existence of a contract; (2) that
the defendant failed to perform his or her obligations
thereunder; (3) that the plaintiff has performed his or her
obligations under the contract; and (4) resulting damages to the
plaintiff.  See W.B. David & Co., Inc. v. DWA Communications,
Inc., No. 02 Civ. 8479, 2004 WL 369147, at *2 (S.D.N.Y. Feb. 26,
2004); Global Intellicom, Inc. v. Thomson Kernaghan & Co., No. 99
Civ. 342, 1999 WL 544708, at *18 (S.D.N.Y. July 27, 1999).


           (a)  Cendant's Failure To Perform (Second Element)[26]
   Cendant asserts that "Section 5.11 of the SPA obligates
Cendant only to use 'reasonable commercial efforts to cause
[Credentials] to continue to be marketed in accordance with the
general historical practices of Cendant's Comp-U-Card division

---

   [26] There is no dispute on the first element, i.e., whether a
contract existed.  The SPA indisputably was a contract.

for marketing' similar products." (Cendant's Mem. of Law at 15.)
The SPA, Cendant says, "does not include any guarantees regarding
membership growth, cross-marketing, the amount of money Cendant
would spend marketing Credentials, or 'marketing the hell' out of
Credentials". (Id.) Cendant's argument fails.

Neither "reasonable commercial efforts" nor "general
historical practices" is defined in the SPA (see SPA, § 1.1), and
they are therefore ambiguous terms.[27] "If ambiguity exists, then
extrinsic evidence of the parties' intent may be looked to as an
aid to construing the contractual language." Sayers v. Rochester
Telephone Corp. Management Pension Plan, 7 F.3d 1091, 1095 (2d
Cir. 1993) (construing New York law). See also RJE Corp v.
Northville Industries Corp., 329 F.3d 310, 315 (2d Cir. 2003).
Where "reasonable minds could differ on the meaning of language
used, the meaning of the words becomes an issue of fact if there
is relevant extrinsic evidence of the parties' actual intent."
Bolt Elec., Inc. v. City of New York, 223 F.3d 146, 150 (2d Cir.
2000) (citations omitted).

---

[27] Very few New York courts have addressed contracts which
use the term "reasonable commercial efforts". An online Westlaw
search for "reasonable commercial efforts" within a database of
decisions by federal and state judiciaries in New York generated
only five decisions, two of which were earlier decisions in this
very case. "Reasonable commercial efforts", therefore, is not a
term which in New York has been defined as a matter of law.

However, Cendant has submitted no evidence which would support its purportedly reasonable interpretation of Section 5.11, and therefore there is no bona fide factual dispute to be decided by a jury.  An examination of the extrinsic evidence establishes that Section 5.11 only could have meant cross-marketing and aggressive marketing.  As stated <u>infra</u>, Maloney testified that Cendant repeatedly assured them that it would use cross-marketing (Maloney Dep. 49:15-23, Pls.' 56.1 Stmt., Ex. 14), and that Cendant promised "it would use [its] muscle [to] far exceed the numbers [Credentials] had anticipated."  (Maloney Dep., 48:20-25, at Pls.' 56.1 Stmt., Ex. 14; <u>see also</u> Thompson Dep. 257:9 - 258:17, at Pls.' 56.1 Stmt., Ex. 29.)  That Cendant employees "absolutely" told Sellers that Cendant had a general practice of cross-marketing and that cross-marketing was Cendant's "business plan", "engine of growth", and "the most important thing to [its] business" further evinces the parties' intent that cross-marketing would have been "in accordance with [Cendant's] general historical practices".  (Weinstein Dep. 253:7 - 255:2, at Pls.' 56.1 Stmt., Ex. 19.)  It also bears reiterating Weinstein's testimony about Cendant's general historical practice of cross-marketing:

> It was their – the number one thing they talked
> about and everything I saw in connection with them.
> I mean, it was their business plan, it was their

> engine of growth, it was the most important thing
> to that business, from everything that I was able
> to read and find and see.

(Weinstein Dep. 253:7 - 255:2, at Pls.' 56.1 Stmt., Ex. 19.)

Indeed, when asked if anything in the SPA was intended to require

Cendant to cross-market, Weinstein testified: "I think that's

what 5.11 was."  (Weinstein Dep. 283:16-22, at Pls.' 56.1 Stmt.,

Ex. 19.)

Cendant attempts to refute all of Sellers' evidence by

denying in its memoranda that any of these statements ever were

made, referring to the statements as "alleged oral statements".

(See, e.g., Defs.' Mem. of Law at 13.)  The evidence put forth by

Cendant, however, is insufficient to create a genuine issue of

material fact: Katz testified that while he "recall[s] that

statements were made", he "[does not] recall what they were,

specifically."  (Katz Dep. 69:23-24, at Pls.' 56.1 Stmt., Ex.

23.)  However, a party's failure to remember what he said is not

sufficient to create a genuine issue of material fact.  See Fed.

R. Civ. P. 56 (requiring that a party "set forth specific facts

showing that there is a genuine issue for trial") Indeed,

Cendant's own Joint Proxy Statement/Prospectus, which was sent to

shareholders to solicit votes for the CUC-HFS merger and which

discussed both HFS and CUC's use of cross-marketing, demonstrates

that cross-marketing was a general historical practice intended

by the parties to be encompassed in Section 5.11.  (See Pls.'
56.1 Stmt., Ex. 1, at CSI/CEN 257190, 257184.)

Cendant's mere denials of its statements — and Katz'
professed inability to recall them — are not sufficient to
warrant sending this question to a jury, much less tilt summary
judgment in Cendant's favor.  Accordingly, the intent of the
parties as evinced by the extrinsic evidence on the record
establishes that Section 5.11 required Cendant to cross-market
and market aggressively Credentials' services.  There are no
facts presented upon which a reasonable jury could decide
otherwise.

The evidence further establishes that Cendant failed to
exercise those marketing obligations.  The documents reporting
Cendant's overwhelming cuts to the Credentials marketing
campaigns soon after the Acquisition (Pls.' 56.1 Stmt., Ex. 92),
along with the Cendant records showing the precipitous drop in
new Credentials memberships in 1998 (Pls.' 56.1 Stmt., Ex. 98, at
007657) establish as a matter of law that Cendant did not fulfill
its promise to market aggressively.

Cendant's counter-argument is that it stopped marketing
Credentials' products because switching from Credentials'
historical use of one-step telemarketing to two-step
telemarketing would be substantially less profitable.  This

argument is specious for two reasons.  First, as addressed in

Section II(D)(1)(b) _infra_, Credentials has submitted no evidence

that two-step telemarketing garnered lower earnings for

Credentials than one-step telemarketing.  Second, Cendant

contends that it used two-step telemarketing for PrivacyGuard,

its own member services division.  PrivacyGuard met with great

success, even in 1998, the year in which Cendant acquired

Credentials.  (Ex. 98 at 7657.)  Cendant, therefore, cannot argue

that it had no obligation or financial wherewithal to do the same

for Credentials.  Accordingly, the Court finds that Cendant

failed to fulfill its obligations under the SPA to cross-market

and market aggressively.


### (b)  Sellers' Alleged Nonperformance (Third Element)

Cendant argues that even if it did violate Section 5.11,

Sellers breached their warranty in Section 3.1(f)(i) of the SPA

that Credentials "is, and has been, in compliance in all material

respects with all applicable laws".  According to Cendant,

Credentials' failure to obtain its customers' written permission

before distributing credit reports to them was in derogation of

the FCRA.  Cendant also argues that Sellers breached Section

3.1(p) of the SPA in which Sellers warranted, in part, that they

were not in default in any material respect of the Experian

Agreement.  Cendant's Section 3.1(p) argument is premised on the

provision in the Experian Agreement requiring Credentials to get

written authorization before obtaining its customers' credit

reports.  These alleged violations, Cendant argues, bar Sellers

from recovering for breach of contract.

But whether Sellers actually violated either Section

3.1(f)(i) or Section 3.1(p) of the SPA is inapposite to

Plaintiffs' Count Three breach of contract claim because

Cendant's affirmation elsewhere of the SPA estops it from

asserting Sellers' alleged nonperformance as a defense.  "The New

York doctrine of election of remedies provides that upon learning

of a breach, a party must choose between terminating the contract

and continuing performance.  If a party chooses to continue

performance, it must give notice of breach to the other side, or

it waives its rights to sue the breaching party."  Medino Ltd. v.

Boston Scientific Corp., 346 F. Supp. 2d 575, 620 (S.D.N.Y.

2004), quoted in RBFC One, LLC v. Zeeks, Inc., 367 F. Supp. 2d

604, 611 (S.D.N.Y. 2005).  Judge Marrero of this District has

elaborated on this rule of New York law:

> Courts of New York and of this District and Circuit
> have long held that, under New York law, "the power
> to terminate a continuing contract because of a
> particular breach of that contract is a power of
> election . . . .  Where a contract is broken in the
> course of performance, the injured party has a
> choice presented to him of continuing the contract

or of refusing to go on. If the injured party chooses to go on, he loses his right to terminate the contract because of the default." Apex Pool Equip. Co. v. Lee, 419 F.2d 556, 562 (2d Cir. 1969) (citations omitted; internal quotations omitted); see ESPN, Inc. v. Office of the Comm'r of Baseball, 76 F. Supp. 2d 383, 387-88 (S.D.N.Y. 1999) (same, adding: "Once a party elects to continue the contract, [it] can never thereafter elect to terminate the contract based on that breach, although [it] retains the option of terminating the contract based on other, subsequent breaches.") (citations omitted; internal quotations omitted) (quoting Bigda v. Fischbach Corp., 898 F. Supp. 1004, 1011-12 (S.D.N.Y. 1995)); Silver Air, 656 F. Supp. at 178 (same, adding: "However, a contract that is not treated as broken continues to exist for the benefit of both parties. There is no specific time limit within which the non-repudiating party must elect his remedy, but if the non-repudiating party himself defaults on the contract before he elects to accept the breach, the other party has the right to act upon his default." (emphasis in original)); Emigrant Indus. Sav. Bank v. Willow Builders, Inc., 290 N.Y. 133, 48 N.E.2d 293, 299 (1943) ("Where a contact is broken in the course of performance, the injured party has a choice presented to him of continuing the contract or of refusing to go on . . . . If the injured party chooses to go on, he loses his right to terminate the contract because of the default." (citations omitted; internal quotations omitted)); Inter-Power of New York, Inc., 686 N.Y.S.2d at 913-14 (same, adding: "The adverse party must, however, make an election and cannot 'at the same time treat the contract as broken and as subsisting. One course of action excludes the other.'") (quoting Strasbourger v. Leerburger, 233 N.Y. 55, 134 N.E. 834, 835 (1922)).

Net2Globe v. Intern., Inc. v. Time Warner Telecom of New York, 273 F. Supp. 2d 436, 457 n.13 (S.D.N.Y. 2003).

On June 15, 1998 (if not earlier), when the Frerichs

Complaint was filed to recompense a class of consumers for
Credentials' purported violations of the FCRA, Cendant was made
aware of Credentials' one-step telemarketing.  In at least three
ways, Cendant thereafter affirmed the SPA.  First, on August 27,
1998, Cendant sought indemnification from Sellers pursuant to
Section 3.1(f) of the SPA for any liability it would incur from
the <u>Frerichs</u> lawsuit.  (<u>See</u> Pls.' 56.1 Stmt. on Count Four, Ex.
7.)  Second, Defendants continued to provide Sellers with
Contingent Payment Certificates at least through mid-1999.
(Lawler Aff. of Jan. 30, 2007, Ex. 55, at JX 193.)  Third,
Cendant paid the first tranche of the Holdback Amount it alleges
it owed under Section 2.3(c) of the SPA.  (Pls.' 56.1 Stmt. on
Count Four, Ex. 4.)  Cendant cannot now claim, after having
affirmed the SPA in these ways, that it had no responsibility to
fulfill its alleged SPA obligations to cross-market and to market
aggressively Credentials' products.  In other words, Cendant
cannot now claim rescission of the SPA for purposes of defending
itself against Sellers' breach of contract claim, while
simultaneously continuing to act under the SPA.  Cendant had to
choose, and by affirming the SPA, it did.  <u>See</u> <u>Silver Air v.
Aeronautic Development Corp., Ltd.</u>, 656 F. Supp. 170, 178
(S.D.N.Y. 1987), <u>quoted in</u> <u>Net2Globe</u>, 273 F. Supp. 2d at 457
n.13.

As a matter of law, any alleged nonperformance by Sellers under the SPA is not a defense to Sellers' Count Three breach of contract claim.[28]

_____

[28] Even were it necessary for this Court to decide whether Credentials was in default in any material respect of the FCRA or the Experian Agreement, the Court finds significant merit to Sellers' arguments on these issues.  The FCRA, which generally requires persons to obtain consumers' written permission before using or obtaining their credit reports, <u>see</u> 15 U.S.C. §§ 1681a & 1681b, likely was not intended to apply where, as here, consumers request their own credit reports from a third party and that third party sends it to them.  <u>Cf.</u> <u>Howard v. Blue Ridge Bank</u>, 2005 WL 1865418, at *2-3 (N.D. Ca., Aug. 1, 2005) (concluding that an entity which delivered credit reports directly to consumers from a consumer reporting agency was not itself a third party subject to relevant provisions of the FCRA).  Credentials' co-mingling of brochures and explanatory letters with the credit reports (<u>see</u> Lawler Aff. of Jan. 30, 2007, Ex. 1; Lawler Aff. of Feb. 28, 2007, Exs. 43-45.) would not make it any more than a "mere conduit".  Moreover, to rule that Credentials' delivery of credit reports to the consumers themselves was in derogation of the FCRA would go unnecessarily beyond Congress' stated purpose in enacting that statute, which was "to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy."  15 U.S.C. § 1681(a)(4).

As well, a reasonable jury could not find that Credentials' use of one-step telemarketing was in material default of the Experian Agreement.  Experian never sued Credentials for that alleged violation, despite very strong evidence that it knew Credentials had not been obtaining written permission from consumers.  (<u>See</u>, <u>e.g.</u>, Thompson Dep. 163:19 - 165:23, at Counterclaim-Defs.' 56.1 Stmt., Ex. 22 (stating that Experian was fully apprised of Credentials' use of one-step telemarketing); Keehan Dep. 138:14-22, at Counterclaim-Defs.' 56.1 Stmt., Ex. 16 ("Experian and Credentials were very close . . . . Employees crossed over, you know, worked in Credentials, worked there . . . . They approved every written script, every written solicitation piece . . . .").)

### (c)   Resulting Damages (Fourth Element)

Nor is there any reasonable doubt about the damages Credentials suffered as a result of Cendant's breach.  Because Cendant failed to cross-market and market aggressively, Sellers did not earn any of the contingent payment.  There is no evidence on the record that the contingent payment would have been anything other than $50,000,000.00.  When asked what Katz told him during the April 6, 1998 phone call, Maloney testified:

> I said, "Look, we haven't heard from your people in two days.  We are in the middle of negotiations. If you don't want to buy the company, just tell me because I don't want to waste time talking to you if you are not going to buy it."  He said, "No, no. We are going to buy the company.  I'm a deal doer. Don't worry.  We will get this thing done.  There is nothing going on.  We are just busy.  We got pulled away in direct [sic] directions," and he said, "We will get the deal done.  You will get your 125 million cash, the earnouts, money good. And you will get back what we originally discussed, the IPO price," and I said, "That's what I want to know," . . . .

(Maloney Dep. 55:5-18, at Pls.' 56.1 Stmt, Ex. 14.)  Weinstein also testified that Katz "pitched" that Cendant would "pay . . . the 125 plus get [Sellers] up to the IPO value with the contingent payment."   (Weinstein Dep. 260:13-17, at Pls.' 56.1 Stmt., Ex. 19.)

Cendant has presented no evidence to contradict Sellers' evidence, that it promised a contingent payment any less than

69

$50,000,000.00, nor is there any proof that Cendant's marketing efforts, if earnestly executed, would have earned Sellers any less than that.  Indeed, Cendant marketed PrivacyGuard's services at a rate that caused that division to exceed its budgeted membership goals in 1998.  (Ex. 98 at 7657.)  In at least one instance, PrivacyGuard exceeded its goals by a margin of over 100%.  (Ex. 98 at 7657.)

It also had to be clear to Cendant that Sellers would not have agreed to the contingent payment clause unless it believed Credentials would earn $50,000,000.00 from the resources and application of CUC marketing to Credentials.  It bears repeating in its entirety Maloney's testimony when he was asked about Cendant's marketing obligations:

> That was a big part of the negotiation was [sic] making sure that we would get our contingent earnout and the assurance that Cosmo [Corigliano] gave us and Sam [Katz] also did, but primarily Cosmo, was that they were going to be able to, quote/unquote, market the hell out of the file and cross-market it and that we wouldn't have any fears of making our earnout and that it would get us back to the IPO price.
>
> Those conversations were kind of continuous because as we would change provisions and negotiated the earnout and things of that nature, I wanted to get assured that we were going to make money on the earnout.  Otherwise, I didn't want to sell the business.  I didn't want to really sell the business at 125. If I thought all we were going to get was 125, I would have just called the sale off.

(Maloney Dep. 320:4-21, Pls.' 56.1 Stmt., Ex. 14.)  As elsewhere, Cendant has submitted no evidence to refute Maloney's testimony.

Accordingly, Cendant's motion for summary judgment on Plaintiffs' Count Three breach of contract claim is hereby DENIED.  Summary judgment is granted in Sellers' favor in the amount of $50,000,000.00 (plus prejudgment interest, see Section II(B)(1)(d) infra) on Plaintiffs' Count Three breach of contract claim.[29]

---

[29] It has long been the law of this Circuit that "as long as some party has made a motion for summary judgment, a court may grant summary judgment to a non-moving party, provided that party has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried."  First Financial Ins. Co. v. AllState Interior Demolition Corp., 193 F.3d 109, 115 (2d Cir. 1999); see also Coach Leatherware Co. v. AnnTaylor, Inc., 933 F.2d 162, 167 (2d Cir. 1991)  (noting that a district court's sua sponte granting of summary judgment in favor of a non-moving party is "an accepted method of expediting litigation", as long as "the facts before the district court were fully developed so that the moving party suffered no procedural prejudice"); Lowenschuss v. Kane, 520 F.2d 255, 261 (2d Cir. 1975) ("We have sanctioned a sua sponte award by the court of summary judgment to a non-moving party where it appeared from the papers, affidavits and other proofs submitted by the parties that there were no disputed issues of material fact and that judgment for the non-moving party would be appropriate as a matter of law.").

Cendant, who moved for summary judgment on the Count Three breach of contract claim has had a full and fair opportunity to establish its case and has provided no "indication that [it] might otherwise bring forward evidence that would affect the court's summary judgment determination."  Coach Leatherware, 933 F.2d at 167.  As the Court has before it all the facts necessary to find for Sellers on this issue, the Court may and does grant summary judgment in their favor on this question sua sponte.

(d)   **Prejudgment Interest**

Under New York statutory law:

> Interest shall be recovered upon a sum awarded
> because of a breach of performance of a contract,
> or because of an act or omission depriving or
> otherwise interfering with title to, or possession
> or enjoyment of, property, except that in an action
> of an equitable nature, interest and the rate and
> date from which it shall be computed shall be in
> the court's discretion.

N.Y.C.P.L.R. 5001(a).  Subsection (b) of this statute provides
that the interest begins to run "from the earliest ascertainable
date the cause of action existed."  Id. at § 5001(b).  This
statute renders the award of prejudgment interest in New York
mandatory.  New England Ins. Co. v. Healthcare Underwriters
Mutual Ins. Co., 352 F.3d 599, 606 (2d Cir. 2003).

There is no evidence from which a jury could ascertain that
the breach occurred any earlier than April 1, 2000 – the day
after Cendant's last contingent payment certificate was due.  The
SPA's contingent payment clause obliged Cendant to report to
Sellers by March 31, 1999 the number of new members it had
acquired for Credentials in 1998.  (SPA, § 2.1(d).)  The
contingent payment clause further provided that:

> Promptly following each calendar quarter during the
> calendar year ending December 31, 1999 and the
> calendar quarter ending March 31, 2000, the Company
> shall deliver to the Sellers' Representative a
> certificate . . . setting forth the number of Net
> New Memberships as of the last day of such

72

immediately preceding calendar quarter . . . .
(SPA, § 2.1(d).)  No witness has testified that Cendant promised
Sellers that its aggressive marketing would earn the
$50,000,000.00 before the end of the contingent payment period.
Nor is there any evidence from which a reasonable jury could
decide what portion of the $50,000,000.00 might have been earned
by any particular date other than by the last day of the
contingent payment period.  Accordingly, the first ascertainable
date of Cendant's breach of the contingent payment clause is
April 1, 2000.

The rate of prejudgment interest is 9 percent per annum, and
is to be calculated on a daily basis up until the date of this
Opinion.  N.Y.C.P.L.R. § 5004.  The prejudgment interest for
Cendant's breach under the contingent payment clause is
calculated as follows:

    Annual interest is $50,000,000.00 x 0.09 =
        $4,500,000.00
    Daily interest is $4,500,000.00/365 days =
        $12,328.77/day
    Interest due is from April 1, 2000 through
        September 7, 2007, a period of 2,715 days.
        Thus, $12,328.77 x 2,715 = $33,472,602.74.

Accordingly, the amount of prejudgment interest due from
Cendant on Sellers' Count Three breach of contract claim is
$33,472,610.55.  For their breach of the contingent payment
clause, therefore, Cendant owes Sellers a total of

$83,472,610.55.

(2)   <u>Second Breach of Contract Claim (Count Four)</u>

Sellers' second breach of contract claim, which is asserted in Count Four of the Third Amended Complaint, alleges that Cendant violated Section 2.3 of the SPA in three ways.  First, Sellers allege that Cendant failed to pay the $562,176.00 balance of the first tranche of the Holdback Amount due under Section 2.3(c)(x) of the SPA, even though, according to Sellers, Citibank earned the entire $9,000,000.00 in commissions.  (Pls.' Mem. of Law on Count Four at 3-5.)  Second, Sellers allege that Cendant failed to pay the entire amount of the second tranche of the Holdback Amount due under Section 2.3(c)(y) of the SPA ($3,200,000.00).  (Pls.' Mem. of Law on Count Four at 5-6.)  Third, Sellers allege that Cendant never paid the portion of the Holdback Amount due under Section 2.3(d) of the SPA ($2,000,000.00).  (Pls.' Mem. of Law on Count Four at 6-15.)  Cendant cites, among other things, Sellers' alleged breaches of the Section 3.1(f)(i) and Section 3.1(p) warranties as the reasons for its nonpayment of all three tranches.[30]

---

[30] Cendant's argument that Sellers' alleged breaches of the Section 3.1(f)(i) and Section 3.1(p) warranties bar Sellers' Count Four breach of contract claim fails.  As with Sellers' Count Three breach of contract claim, Cendant did not elect in a

### (a)   First Section 2.3(c) Tranche

_____Cendant alleges that it does not owe Sellers any more than the $3,120,935.00 it already paid under the first tranche of Section 2.3(c) because as of March 1, 1999, the commissions earned by Citibank were $562,176.00 less than $9,000,000.00. Sellers argue that Citibank received more than $9,000,000.00 in commission payments.

To support its position, Cendant has submitted the Officer's Certificate it delivered to Sellers on March 1, 1999, which calculated the total commissions earned for Citibank as $8,437,824.00, and which stated that therefore Cendant was not required to pay, after including interest, more than $3,120,935.00 of the first $3,500,000.00 tranche.  (Pls.' 56.1 Stmt. on Count Four, Ex. 4.)  Sellers, on the other hand, submit a chart from Citibank's files entitled "Total 1999 Forecast @FYF2" which lists Credit/Update's "Net Revenue 1998" as $9,698,000.00.  (Pls.' 56.1 Stmt. on Count Four, Ex. 47, at CITI 00210.)  Tracy Katz, a Citibank Employee, has testified that this chart means that the actual net revenue in 1998 for the Credentials' product at issue was $9,698,000.00.  (Katz Dep.

---

timely fashion the remedy of rescission.  Nor, as stated in Section II(D)(1), _infra_, has Cendant met its burden to prove that Sellers violated those provisions.

149:19-151:7, at Pls.' 56.1 Stmt. on Count Four, Ex. 47.)

Cendant's March 1, 1999 Officer's Certificate is not admissible.  It is hearsay.  <u>See</u> Fed. R. Ev. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").  Hearsay is inadmissible at trial unless it falls under one of the exceptions listed in Rule 803 of the Federal Rules of Evidence.  <u>See</u> Fed. R. Ev. 802.  None of the Rule 803 exceptions apply to the Officer's Certificate.

Cendant argues that the document is admissible hearsay under the business record exception.  <u>See</u> Fed. R. Ev. 803(6).  Specifically, that rule renders admissible:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation . . . .

Fed. R. Ev. 803(6).  "The principal precondition to admission of documents as business records . . . is that they have sufficient indicia of trustworthiness to be considered reliable."  <u>Ortho Pharmaceutical Corp. v. Cosprophar, Inc.</u>, 828 F. Supp. 1114, 1119 (S.D.N.Y. 1993), <u>quoting</u> <u>Saks Int'l, Inc. v. M/V "Export</u>

Champion", 817 F.2d 1011, 1013 (2d Cir. 1987).  Courts have
emphasized the regularity of the production of such records,
noting that documents produced as a matter of "routine" may be
trusted.  See, e.g., Ortho Pharmaceutical Corp., 828 F. Supp. at
1119 (S.D.N.Y. 1993), citing Palmer v. Hoffman, 318 U.S. 109,
113-14 (rationale behind the predecessor to Rule 803(6) was that
routine reflections of day to day operations of a business were
considered trustworthy).

Cendant concedes that the March 1, 1999 Officer's
Certificate was produced only once to fulfill its obligations
under the SPA.  (See Cendant's Mem. in Opp. to Counterclaim-
Defs.' Mot. for Summ. J. at 44 (stating that the Officer's
Certificate was "prepared only once").)  Because it is not a
document produced routinely, the March 1, 2007 Officer's
Certificate does not have the reliability indicia required under
Rule 803(6), especially in light of the fact that no data to back
up the Officer's Certificate has been produced.

Therefore, Cendant has produced no admissible evidence to
counter the testimony by Citibank employees and Citibank records
produced by Sellers.  Cendant proffers arguments only, not
evidence, to attack the credibility of the Citibank employees'
testimony about the Citibank records.  (See Cendant's Mem. in
Opp. to Counterclaim-Defs.' Mot. for Summ. J. at 40-42.)

Accordingly, there is no evidence from Cendant by which a
reasonable jury could find in its favor on the first Section
2.3(c) tranche.  See Rubens v. Mason, 387 F. 3d 183, 189 (2d Cir.
2004), citing Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d
Cir. 1994) (a court may consider on a summary judgment motion
only evidence which would be admissible at trial).

Accordingly, Sellers' Motion for Summary Judgment on Count
Four as to the first Section 2.3(c) tranche is hereby GRANTED,
and Cendant's Motion for Summary Judgment as to the first Section
2.3(c) tranche is hereby DENIED.[31]


### (b)   Second Section 2.3(c) Tranche

Sellers argue that Cendant owes them the $3,200,000.00 due
under the second Section 2.3(c) tranche because, even if Cendant
is permitted to retain $562,176.00 from the first tranche, there
is no evidence of any further commissions not earned by Citibank
which would permit Cendant to retain an additional $3,200,000.00.
Cendant argues that its retention of the second Section 2.3(c)

---

[31] In addition to the element of Cendant's nonperformance,
every other element of breach of contract has been met as to
Count Four as a matter of law.  The SPA was a contract (first
element), Sellers' alleged nonperformance, even if true, is not a
valid defense for the reasons addressed supra (third element),
and Cendant's breach has resulted in damages of $562,176.00
(fourth element).

tranche is to indemnify it for any SPA breaches by Sellers, i.e., Sellers' alleged breaches of their Section 3.1(f)(i) and Section 3.1(p) warranties as claimed in Cendant's Counterclaim Two.

Cendant's argument fails because its indemnification counterclaim, as addressed at Section II(D)(1), _infra_, is without merit.  But even if that counterclaim did have merit, there is no basis in the SPA for Cendant to retain Section 2.3(c) payments as insurance against any and all liabilities which it may incur because of an SPA breach by Sellers.  The tranches of the Holdback Amount addressed in Section 2.3(c) referenced only the Citibank Agreement.  (SPA, § 2.3(c).)  Section 2.3(c) expressly required Cendant to make one payment of $3,500,000.00 to Sellers and then another payment of $3,200,000.00 to Sellers, unless Credentials did not meet its requirement to earn $9,000,000.00 in commissions for Citibank.  (SPA, § 2.3(c).)  Section 2.3(c) said nothing about other liabilities or breaches.

Cendant argues that Section 6.2 of the SPA permits it to retain the $3,200,000.00.  Section 6.2 made Sellers' satisfaction of their SPA warranties a condition precedent only to Cendant's obligation to "consummate the Acquisition and the other transactions contemplated by [the SPA]".  (SPA, § 6.2.)  There is no evidence that "other transactions contemplated by [the SPA]" referred to transactions, like the Holdback Amount payments,

which were to follow the consummation of the Acquisition by almost a year.  Rather, the other "transactions" contemplated by Section 6.2 clearly were, as Sellers argue, the transfer of stock, the wiring of funds, and the execution of other necessary instruments.  (Pls.' C4 Reply Mem. of Law at 32).  Indeed, the title of Section 6.1, which immediately precedes Section 6.2, is "Conditions to Each Party's Obligation To Effect the Acquisition", and says nothing about transactions scheduled to take place later.

On March 1, 1999, Cendant itself did not interpret Section 6.2 as permitting it to retain the first Section 2.3(c) tranche because of any alleged breach of warranty by Sellers.  Cendant made that first Section 2.3(c) payment in a timely fashion, even though at the time it made that payment, it had been aware of Sellers' use of one-step telemarketing for almost a year.

It is worth noting that had the parties intended Section 2.3(c) to incorporate Section 6.2, they would not have set out such a detailed payment schedule in Section 2.3(c).  Nor would they have followed Section 2.3(c) with a separate Section 2.3(d), which permits Cendant to retain $2,000,000.00 of the Holdback Amount in the event that any Seller failed to meet its obligations or warranties in the SPA.  (See SPA, § 2.3(d), citing §§ 8.1(b)(i) & (ii).)  Interpreting Section 6.2 as permitting

Cendant to retain the second Section 2.3(c) tranche for all potential breach of warranty liabilities would render the separation of Section 2.3(c) from Section 2.3(d) superfluous.

Cendant also argues that Section 8.6 of the SPA affords it the right to retain the second Section 2.3(c) tranche.  Section 8.6 stated that Cendant would not seek indemnification payments from Sellers except to the extent that the Holdback Amount had been reduced to zero.  (See Cendant's Mem. in Opp. to Mot. for Summ. J. at 38.)  This does not mean what Cendant argues it means.  Rather, Section 8.6 provides that only after Cendant pays all of the Holdback Amount as required by the various provisions of the SPA and only after such payments reduce the Holdback Amount to zero, may Cendant then seek indemnification.  Section 8.6 does not permit Cendant to retain portions of the Holdback Amount otherwise due, simply because Sellers may have breached their SPA warranties.

Cendant's argument that Section 2.3(a) permits it to retain the second Section 2.3(c) tranche because of any alleged breach by Sellers also is without merit.  Section 2.3(a) permits Cendant to "hold the Holdback Amount until the Final Distribution Date", at which time Cendant was required to pay what of the Holdback Amount it owed "after giving effect to", among other things, indemnification due to Cendant.  However, the provisions of

81

Section 2.3(a) are expressly subject to Sections 2.3(b)-(g).

For these reasons, Sellers' Motion for Summary Judgment on Count Four as to the second Section 2.3(c) tranche is hereby GRANTED, and Cendant's Motion for Summary Judgment as to the second Section 2.3(c) tranche is hereby DENIED.

### (3)   Section 2.3(d) Tranche

Unlike Section 2.3(c), Section 2.3(d) specifically permits Cendant to retain $2,000,000.00 of the Holdback Amount pending the resolution of its indemnification claims against Sellers. (See SPA, § 2.3(d), citing §§ 8.1(b)(i) & (ii).)  However, as addressed infra at Section II(D)(1), Cendant's indemnification counterclaim does not survive Counterclaim-Defendants' Motion for Summary Judgment.  Because Cendant has agreed to release Sellers "from any liability whatsoever for any damages, costs, or expenses of any kind that in any way arise out of or relate to the [Frerichs case]" (see Stipulation, at Doc. 123, No. 00 Civ. 1422 (DAB), and at Pls.' 56.1 Stmt. on Count Four, Ex. 20), and because the record sets forth no other potential liabilities which may be owed by Sellers, no reasonable jury could find that Cendant has properly retained the Section 2.3(d) tranche of the Holdback Amount.

Accordingly, Sellers' Motion for Summary Judgment on Count

82

Four as to the Section 2.3(d) tranche is hereby GRANTED, and
Cendant's Motion for Summary Judgment as to the Section 2.3(d)
tranche is hereby DENIED.

### (d)   Prejudgment Interest

Pursuant to this Court's grant of summary judgment to
Sellers on the three Section 2.3 Holdback Amount tranches, supra,
Cendant owes Sellers $562,176.00 of the first Section 2.3(c)
tranche, $3,200,000.00 of the second Section 2.3(c) tranche, and
$2,000,000.00 of the Section 2.3(d) tranche – for a total of
$5,762,176.00.  Cendant owed the first Section 2.3(c) as of March
1, 1999 (SPA, § 2.3(c)(x)), the second Section 2.3(c) tranche as
of March 31, 1999 (SPA, § 2.3(c)(y)), and the third Section
2.3(d) tranche as of September 10, 1999 (SPA, § 2.3(d))[32].

---

[32] Not only are these dates in the SPA, but they also are the
same dates listed in Sellers' calculation for prejudgment
interest in their Memorandum of Law in Support of the Motion for
Summary Judgment on Count Four at 17.  Cendant has not contested
these dates.  (See Cendant's Opp. Mem. of Law at 44.)
    Nor would it be improper to calculate prejudgment interest
on recovery due under the Section 2.3(d) tranche.  True, Cendant
was permitted to retain that particular portion of the Holdback
Amount pending resolution of claims for Sellers' SPA breaches.
However, Cendant's indemnification counterclaim, as decided in
Section II(D)(1) infra, is without merit.  It would be
inequitable to allow Cendant to elude prejudgment interest simply
by bringing a frivolous counterclaim, spending years in needless
discovery, and then waiting for this Court to adjudicate that
counterclaim.

As with the Count Three breach of contract claim, the rate of prejudgment interest is 9 percent per annum, and is to be calculated on a daily basis through the date of this Opinion.[33] N.Y.C.P.L.R. § 5004.  The prejudgment interest for Cendant's failure under the first Section 2.3(c) tranche is calculated as follows:

```
Annual interest is $562,176.00 x 0.09 = $50,595.84
Daily interest is $50,595.84/365 days =
     $138.62/day
Interest due is from March 1, 1999 through
     September 7, 2007, a period of 3,111 days.
     Thus, $138.62 x 3,111 = $431,381.52.
```

The prejudgment interest for Cendant's failure under the second Section 2.3(c) tranche is calculated as follows:

```
Annual interest is $3,200,000.00 x 0.09 =
     $288,000.00
Daily interest is $288,000.00/365 days =
     $789.04/day
Interest due is from March 31, 1999 through
     September 7, 2007, a period of 3,081 days.
     Thus, $789.04 x 3,081 = $2,431,824.66.
```

The prejudgment interest for Cendant's failure under the Section 2.3(d) tranche is calculated as follows:

```
Annual interest is $2,000,000.00 x 0.09 =
```

---

[33] While Sections 2.3(c) and 2.3(d) provide that a 7% annual interest rate is to be added to the principal due under the Holdback Amount payments, the 7% interest rate assumes not that Cendant was in breach of these provisions, but that it was making the payments in a timely fashion.  Because Cendant is in breach of Section 2.3(c) and 2.3(d), the Court uses the mandatory N.Y.C.P.L.R. § 5004 interest rate of 9% for contract breaches.

```
        $180,000.00
Daily interest is $180,000.00/365 days =
        $493.15/day
Interest due is from September 10, 1999 through
        September 7, 2007, a period of 2,920 days.
        Thus, $493.15 x 2,920 = $1,439,506.85.
```

Therefore, the total prejudgment interest due on Sellers' Count

Four breach of contract claim is $4,302,277.06.  Added to the

principal amount due of $5,762,176.00, the total amount Cendant

owes Sellers for its breaches pursuant to Count Four of the Third

Amended Complaint is $10,064,453.06[34].


        (e)  **Attorneys' Fees**

    Sellers also have moved this Court to award them attorneys'

fees for their litigation of the Count Four breach of contract

claim.  Cendant's only opposing argument is that it did not

breach the SPA, and therefore should not be ordered to pay

attorneys' fees to Sellers.  (Cendant's Opp Mem. to Pls.' Mot.

for Summ. J. at 44.)

    "Under the general rule in New York, attorneys' fees are the

ordinary incidents of litigation and may not be awarded to the

prevailing party unless authorized by agreement between the

parties, statute, or court rule.  Oscar Gruss & Son, Inc. v.

---

    [34] This total does not include any amount which may be due
for Sellers' attorneys fees related to Count Four.  See Section
II(B)(2)(e), infra.

Hollander, 337 F.3d 186, 199 (2d Cir. 2003) (citing Bourne Co. v.

MPL Communications, Inc., 751 F. Supp. 55, 57 (S.D.N.Y. 1990) and

A.G. Ship Maint. Corp. v. Lezak, 69 N.Y.2d 1, 5, 511 N.Y.S.2d

216, 503 N.E.2d 681 (1986)).  "While parties may agree that

attorneys' fees should be included as another form of damages,

such contracts must be strictly construed to avoid inferring

duties that the parties did not intend to create."  Oscar Gruss &

Son, 337 F.3d at 199 (citing Hooper Assocs., Ltd. v. AGS

Computers, Inc., 74 N.Y.2d 487, 491, 549 N.Y.S.2d 365, 548 N.E.2d

903 (1989)).

     The Second Circuit has deemed the New York Court of Appeals

decision in Hooper to be especially instructive in determining

whether a contract provides for attorneys' fees for breaches.

See Oscar Gruss & Son, 337 F.3d at 200 (citing Hooper, 74 N.Y.2d

487 at 491).  According to Oscar Gruss & Son, the Hooper court:

> was confronted with an indemnification clause that
> obligated the defendant to "indemnify and hold
> harmless [plaintiff] . . . from any and all claims,
> damages, liabilities, costs and expenses, including
> reasonable counsel fees" arising out of breach of
> warranty claims, performance of services, and
> infringement of patents, copyrights or trademarks.
> [Hooper] at 492, 549 N.Y.S.2d 365, 548 N.E.2d 903
> (internal quotation marks omitted) (alteration and
> ellipses in original).  The Court of Appeals found
> that the indemnity clause related to third-party
> claims, and was neither "exclusively or
> unequivocally referable to claims between the
> parties themselves [nor] support[ed] an inference
> that defendant promised to indemnify plaintiff for

> counsel fees in an action on the contract." Id. A
> finding that the indemnification clause did not
> reach suits between the parties was also supported
> "by other provisions in the contract which
> unmistakably relate to third-party claims." Id.

337 F.3d at 200.

Unlike the contract in Hooper, the SPA is specific in its

reference to attorneys' fees relating to a contracting party's

breach.  Section 8.1(c) of the SPA requires Cendant to pay for

any "Loss" incurred to Sellers from Cendant's breaches.  (SPA, §

8.1(c).)  Specifically, that section provides that Cendant:

> agrees to indemnify and hold harmless each Seller .
> . . against any Loss resulting from arising out of
> or based upon: (i) any failure by Cendant to
> perform any of its covenants or obligations
> pursuant to this Agreement . . . .

(SPA, § 8.1(c).)  According to Section 1.1, "Loss" is a term of

art in the SPA, and is defined in Section 8.1(a).  (SPA, § 1.1.)

Section 8.1(a), which happens to be the Section that enumerates

Sellers' indemnification obligations, defines "Loss" as "any and

all loss, liability, claim, damage, deficiency, award,

assessment, amount paid in settlement, judgment, fine, penalty,

cost and expense whatsoever, including without limitation

reasonable legal fees and disbursements incurred in connection

therewith . . . ."  (SPA, § 8.1(a).)

Read together, Sections 8.1(a) and 8.1(c) refer to legal

fees incurred by Sellers because of any SPA breach by Cendant.

87

Had Cendant not breached Section 2.3 of the SPA, i.e., had
Cendant not retained improperly the three Section 2.3 tranches of
the Holdback Amount, Sellers would not have been responsible for
legal fees it paid to recover those tranches.

However, Sellers have submitted no evidence on the amount of
attorneys' fees owed as a result of Cendant's Section 2.3
breaches.  Accordingly, Sellers' motion for attorneys' fees
arising out of their Count Four breach of contract claim is
hereby GRANTED.  To recover reasonable fees for its litigation of
Count Four, Sellers shall file and serve within thirty days of
the date of this Opinion an affidavit which details their
attorneys' fees related to their Count Four breach of contract
claim.  Cendant shall respond, if it chooses to do so, within
thirty days of receipt of Sellers' affidavit.

### (3)   Breach of the Covenant of Good Faith and Fair Dealing Claim (Count Six)

New York law implies a covenant of good faith and fair
dealing in all contracts.  See Global Intellicom, Inc. v. Thomson
Kernaghan & Co., 1999 WL 544708, at *18 (S.D.N.Y. Jul. 27, 1999)
(citing Carvel Corp. v. Diversified Management Group, Inc., 930
F.2d 228, 230 (2d Cir. 1991)).  The covenant "precludes each
party from engaging in conduct that will deprive the other party

of the benefits of their agreement." <u>Leberman v. John Blair &</u>
<u>Co.</u>, 880 F.2d 1555, 1560 (2d Cir. 1989).  Hence, the covenant is
violated "when a party to a contract acts in a manner that,
although not expressly forbidden by any contractual provision,
would deprive the other of the right to receive the benefits
under the agreement." <u>Don King Productions, Inc. v. Douglas</u>, 742
F. Supp. 741, 767 (S.D.N.Y. 1990).  "The implied covenant does
not . . . operate to create new contractual rights; it simply
ensures that parties to a contract perform the substantive,
bargained-for terms of their agreement and that parties are not
unfairly denied express, explicitly bargained-for benefits."  <u>Id.</u>
(citations and internal quotations omitted).

    In most circumstances, claims for breach of contract and the
covenant of good faith and fair dealing are duplicative; however,
in some cases "a party may be in breach of its implied duty of
good faith and fair dealing even if it is not in breach of its
express contractual obligations." <u>Chase Manhattan Bank v.</u>
<u>Keystone Distributors, Inc.</u>, 873 F. Supp. 808, 815 (S.D.N.Y.
1994).  When "the conduct allegedly violating the implied
covenant is also the predicate for a claim for breach of covenant
of an express provision of the underlying contract," the two
claims are duplicative.  <u>In re Houbigant, Inc.</u>, 914 F. Supp. 964,
989 (S.D.N.Y. 1995).  A claim for breach of the covenant of good

faith and fair dealing "may be brought, if at all, only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain." <u>Sauer v. Xerox Corp.</u>, 95 F. Supp. 2d 125, 132 (W.D.N.Y. 2000).

Cendant's express promises to market aggressively and to cross-market Credentials' products were included in the "reasonable commercial efforts" and "general historical practices" language in the SPA.  <u>See</u> Section II(B)(1)(a) <u>supra</u>. Sellers' breach of the covenant of good faith and fair dealing claim re-alleges that Cendant's failure to use various marketing tactics was in bad faith.  (<u>See</u> Third Am. Compl. ¶ 169.)  Thus, Sellers' breach of the covenant of good faith and fair dealing claim is duplicative of their Count Three breach of contract claim.

Accordingly, Cendant's motion for summary judgment on Sellers' breach of the covenant of good faith and fair dealing claim is hereby GRANTED.

### (4)  Accounting Claim (Count Seven)

An accounting claim is not proper where money damages are recoverable under alternative causes of action for the same injury.  <u>Banks v. Correctional Services Corp.</u>, 475 F. Supp. 2d

189, 202 (E.D.N.Y. 2007).  Because Sellers have sought money damages under their breach of contract claims, and because discovery has already proceeded as to the measure of damages available to them should they prevail on those claims, summary judgment is hereby GRANTED in Cendant's favor on the accounting claim.  <u>Cf.</u> <u>id.</u> (accounting claim dismissed on motion to dismiss where extent of damages would be discoverable in the event that plaintiff succeeded on his breach of contract claim).

> ### (5)   <u>§ 10(b) Securities Fraud Claim (Claim One) and Common Law Fraud Claim (Claim Two)</u>

Fraud claims should be dismissed as redundant when the only fraud alleged is that the defendants were not sincere when they promised to perform under the contract.  <u>First Bank of Americas v. Motor Car Funding, Inc.</u>, 257 A.D. 2d 287, 690 N.Y.S.2d 17 (1st Dept. 1999), <u>cited in</u> <u>Spencer Trask Software and Information Services LLC v. Rpost Intern. Ltd.</u>, 383 F. Supp. 2d 428, 453 (S.D.N.Y. 2003).

Sellers' fraud claims allege that Cendant fraudulently promised to cross-market and market aggressively Credentials' products, but that it never fulfilled that promise after it was memorialized in the SPA.  This is equivalent to Sellers' Count Three breach of contract claim, which alleges that after the

parties had a meeting of the minds as to what was meant by

"reasonable commercial efforts" in accordance with Cendant's

"general historical practices", Cendant chose to ignore that

agreed-upon meeting.  True, Sellers' common law fraud claim[35]

also alleges that Cendant acted fraudulently by failing to tell

Sellers about the CUC accounting fraud, cf. Deerfield

Communications Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954,

956 (1986) (finding that a misrepresentation regarding a present

fact may give rise to a claim for fraudulent inducement separate

and apart from a breach of contract claim), but this

misrepresented fact relates directly to Cendant's promise to

cross-market and market aggressively.  Where "a party obligates

itself to a payment of money, a representation concerning that

party's ability to pay is indivisible from the contract".  C3

Media & Marketing Group, LLC v. Firstgate Internet, Inc., 419 F.

Supp. 2d 419, 432 (S.D.N.Y. 2005), citing Dupont Flooring Sys.,

Inc. v Discovery Zone, Inc., 2004 WL 1574629, at *11-12 (S.D.N.Y.

Jul. 14, 2004).  In other words, Cendant's failure to inform

Sellers about the CUC accounting fraud is relevant only because

accurate information about the CUC accounting fraud would have

---

[35] Plaintiffs concede that Cendant's alleged omissions
relating to the CUC accounting fraud are not actionable under
Section 10(b).  (Pls.' Opp. Mem. of Law at 31-32.)

indicated to Sellers that CUC had no intention, and perhaps no ability, to earn the contingent payment.  Sellers offer no affirmative evidence that the CUC accounting fraud would have been relevant in any other way to their decision to enter into the SPA.  Nor do Sellers argue successfully that they suffered any harm separate and apart from the loss of the contingent payment and the Holdback Amount payments.[36]

However, a fraud claim may be brought alongside a claim for failure to perform under an alleged contract in three circumstances: "(1) where there is a legal duty separate from the duty to perform under the contract; (2) where there is a 'fraudulent misrepresentation collateral or extraneous to the contract'; or (3) where the misrepresentation causes special damages that are 'unrecoverable' as contract damages."  Spencer Trask, 383 F. Supp. 2d 428, 453, citing Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996).

Sellers' fraud claims do not satisfy any of these exceptions.  First, Cendant had no legal duty separate and apart from the contract.  Any ongoing duty by Cendant to cross-market and market aggressively Credentials' products arose as a result

---

[36] But see the Court's discussion infra on Sellers' unsuccessful request for punitive damages.

of the contingent payment clause.  While that ongoing duty may
have created a relationship, such relationship arose out of the
contract itself.

Second, there was no fraudulent misrepresentation which was
collateral or extraneous to the contract.  Cendant's obligation
to be truthful about its marketing intentions mattered only
because Sellers relied on Cendant's statements when deciding
whether to sign the SPA.

Third, there are no special damages available under the
fraud claims which are not available under the Count Three breach
of contract claim.  While Sellers seek up to $250,000,000.00 in
punitive damages for Cendant's common law fraud (Third Am. Compl.
¶ 141)[37], Sellers have not produced any proof satisfying the very
high standard in New York for punitive damages.

In New York, a defendant liable for common law fraud faces
punitive damages only when the claimant alleges "conduct which is
'aimed at the public generally,' involves 'a fraud evincing a
high degree of moral turpitude' and demonstrates 'such wanton
dishonesty as to imply a criminal indifference to civil
obligations.'" Manning v. Utilities Mut. Ins. Co., Inc., 254 F.3d

---

[37] Punitive damages are unavailable for claims of securities
fraud under Section 10(b).  Boguslavsky v. Kaplan, 159 F.3d 715,
721 (2d Cir. 1998), citing Flaks v. Koegel, 504 F.2d 702, 706 (2d
Cir. 1974).

387, 400 (2d Cir. 2001).  New York courts have clarified that the "public harm" requirement need not be satisfied where a "legal duty independent of the contract itself has been violated . . . . This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract . . . ."  <u>Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.</u>, 70 N.Y.2d 382, 389, (1987), <u>quoted in</u> <u>Langenberg v. Sofair</u>, 2006 WL 3518197, at *4 (S.D.N.Y. Dec. 7, 2006).  <u>See also</u> <u>Sofi Classic S.A. de C.V. v. Hurowitz</u>, 444 F. Supp. 2d 231, 247-48 (S.D.N.Y. 2006), <u>quoting</u> <u>Rocanova v. Equitable Life Assurance Soc'y of U.S.</u>, 634 N.E.2d 940, 943-44 (N.Y. 1994) ("To recover punitive damages for a tort claim that 'arises from' a related contract claim, a plaintiff must demonstrate that the alleged misconduct was aimed at the public generally and that the misconduct evinced a 'high degree of moral turpitude' such as to imply a 'criminal indifference to civil obligations.'"); <u>Merrill Lynch & Co., Inc. v. Alleghany Energy Inc.</u>, 382 F. Supp. 2d 411, 422 (S.D.N.Y. 2003) (holding that the "public harm" requirement applies to fraudulent inducement claims because the fraud claims "arise from" related contract claims).

Sellers have produced no evidence of any public harm.  The gravamen of Sellers' common law fraud claim pertains to Cendant's persuading them to enter into the SPA by making false promises

that it would cross-market and market aggressively Credentials'
products even though it never intended to do so.  This conduct
did not harm the general public.  While Sellers have submitted
evidence that Silverman represented to the market on the April 9,
1998 analyst call that Cendant's finances were in great shape
(Pls.' 56.1 Stmt., Ex. 38 at CAA/CSI 02459, CAA/CSI 02465), the
injuries for which Sellers are seeking redress do not relate in
any way to any injury which may have been incurred by other
investors as a result of Silverman's false optimism.  Nor do
Sellers submit evidence about any actual harm that Silverman's
misrepresentations caused the public.  Sellers submit the
transcript of the April 9, 1998 analyst call as evidence of their
own pre-Acquisition expectations, not the public's.  Accordingly,
no reasonable jury could award punitive damages to Sellers at a
trial.[38]

     For these reasons, Cendant's summary judgment motion on

_____

     [38] It is also worth noting that even were this Court to find,
pursuant to the three Brigestone/Firestone exceptions, that
Sellers' fraud claims were not duplicative with Sellers' Count
Three breach of contract claim, there is no evidence that Sellers
suffered any damages resulting from the alleged fraud which was
separate and apart from the $50,000,000.00 (plus interest)
Cendant failed to earn for Sellers.  Because this Court already
has found in favor of Sellers on the Count Three breach of
contract claim and because Sellers have not submitted evidence to
support the other form of damages they seek, i.e., punitive
damages, permitting Sellers' fraud causes of action to proceed as
independent claims would be redundant.

Sellers' Section 10(b) securities fraud claim and on Sellers' common law fraud claim is GRANTED because those claims are redundant with Sellers' Count Three breach of contract claim.

### (6)   Negligent Misrepresentation (Count Eight)

In New York, the analysis applied to determine whether a negligent misrepresentation claim is duplicative with a breach of contract claim is the same as the analysis used to determine whether a common law fraud claim is duplicative with a breach of contract claim.  Clark-Fitzpatrick, 70 N.Y.2d at 389 ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated."); see also Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A., 2007 WL 1988144, at *10 (S.D.N.Y. Jul. 9, 2007); PPI Enterprises (US), Inc. v. Del Monte Foods Co., 2003 WL 22118977, at *26 (S.D.N.Y. Sep. 11 2003).

Accordingly, for the same reasons that Sellers' fraud claims were dismissed, Cendant's summary judgment motion on Sellers' negligent misrepresentation claim is hereby GRANTED.

C.   <u>Silverman's and Katz' Motions</u>

Silverman and Katz both argue that Sellers' common law fraud and negligent misrepresentation claims should be dismissed against them.  They do not argue that those claims should be dismissed because those claims are redundant with Sellers' Count Three breach of contract claim[39], but it is for this reason that the Court shall decide Silverman's and Katz' motions in their favor.

Where individual defendants who are officers of a corporation are sued for fraud because of misrepresentations they made about the corporation's intent to fulfill its contract obligations, those individual defendants may not be sued separately for fraud.  <u>See</u> <u>C3 Media & Marketing</u>, 419 F. Supp. 2d at 432 (finding that individual defendant who misrepresented corporation's "financial wherewithal" could not be held liable for that corporation's defaulting on its contractual obligations); <u>Page v. Muze, Inc.</u>, 270 A.D.2d 401, 402, 705 N.Y.S.2d 383, (2d Dept. 2000) (dismissing claims for fraud against corporate and individual defendants where the only fraud alleged "relate[d] to" the corporate defendant's breach of a contract).  A breach of contract claim against the corporate

---

[39] **Nor is this Court deciding in their favor the arguments they do raise in their Memoranda.**

signatory, i.e., Cendant, is the proper – and non-redundant – vehicle for recovery.

Accordingly, Katz' and Silverman's Motion for Summary Judgment is hereby GRANTED.  For the same reasons, summary judgment also is hereby GRANTED in favor of Defendant Cosmo Corigliano on all claims against him.

D.    Counterclaim-Defendants' Motion on Cendant's Counterclaims

(1)    Indemnification Counterclaim (Counterclaim Two)

Sellers, as Counterclaim-Defendants, also have moved for summary judgment on Cendant's counterclaims against them.  In Counterclaim Two, Cendant seeks indemnification for Sellers' alleged breach of Section 3.1(f)(i) in which Sellers warranted that Credentials was in compliance with all laws in all material respects.  Cendant also seeks indemnification for Sellers' alleged breach of Section 3.1(p) in which Sellers warranted that Credentials was not in material default of the Experian Agreement.

The elements of Cendant's counterclaim for indemnification are the same as the elements for Sellers' Count Three breach of contract claim.  See Section II(B)(1), supra, stating that the elements for breach of contract are: (1) the existence of a contract; (2) that the counterclaim-defendant failed to perform

99

his or her obligations thereunder; (3) that the counterclaim-plaintiff has performed his or her obligations under the contract; and (4) resulting damages to the counterclaim-plaintiff.  As with the Count Three breach of contract claim, the parties do not dispute that the existence-of-a-contract element is met by the existence of the SPA.

The Court need not address whether Sellers' alleged violations of the Fair Credit Reporting Act and of the Experian Agreement amounted to violations of the SPA.  Rather, this Court concludes that Cendant has not met its burden to prove either its own performance under the contract (third element) or resulting damages from Sellers' alleged breach (fourth element).

As for the third element, this Court held in Sections II(B)(1) & (2), supra, that Cendant did not perform its own obligations under Sections 2.1, 2.3(c), 2.3(d), and 5.11 of the SPA.  Those failures prohibit Cendant from succeeding on its indemnification counterclaim.  What is more, Cendant has not satisfied the fourth element, i.e., proof of any damages which resulted from Sellers' alleged failure to inform Cendant about Credentials' use of one-step telemarketing.  While Cendant seeks to submit an expert report from Frederick C. Dunbar as evidence of its damages, his report does not corroborate any claim for damages in any way.  (See Dunbar Report, at Counterclaim-Defs.'

56.1 Stmt., Ex. 60 ("Dunbar Report").)  Dunbar calculated damages

using two methods: (1) alleged out-of-pocket damages to Cendant

and (2) alleged benefit of the bargain damages.


    (a) <u>Alleged Out-Of-Pocket Damages</u>

  The alleged out-of-pocket damages, as calculated by Dunbar,

presume that Cendant would not have acquired Credentials had it

known about its use of one-step telemarketing.  As Dunbar states,

"[t]his method of estimating damages essentially unwinds the

[A]cquisition.  The out-of-pocket damages, then, are the

difference in the value of the benefits received by Cendant from

the [A]cquisition and the value of the costs incurred by Cendant

as a result of the [A]cquisition."  (Dunbar Report at 4.)

Cendant's applying this method for calculating damages is

improper as a matter of law.

  Indemnification damages can only be recovered when the

damages are shown to have resulted directly from the breach.  <u>See</u>

<u>CompuDyne Corp. v. Shane</u>, 453 F. Supp. 2d 807, 832 (S.D.N.Y.

2006) ("The standard for pleading damages from a breach of

contract are virtually the same as that for pleading loss

causation.  Both are satisfied where the damage is alleged to

have been proximately caused by the wrongdul conduct.").

Cendant's argument that it should recover everything it allegedly

lost by acquiring Credentials fails because there is no evidence
that all of those alleged losses actually stemmed from
Credentials' use of one-step telemarketing.  Cendant's unadorned
allegation that it would not have purchased Credentials had it
known of the FCRA and Experian Agreement violations is not
sufficient to support the causation requirement.  Accordingly,
Cendant's claim for out-of-pocket damages is uncorroborated and
without merit.


            (b)   <u>Alleged Benefit of the Bargain Damages</u>

      To determine the alleged benefit of the bargain damages,
Dunbar computed "the difference . . . between the value that
Cendant bargained for the [A]cquisition and the value that
Cendant received."  (Dunbar Report at 8.)  Dunbar presumed for
purposes of computing benefit of the bargain damages that "as a
result of the alleged breaches, Cendant changed Credentials'
telemarketing scripts and other marketing material and that as a
result of this change, the telemarketing response rates were
reduced by 20%."  (<u>Id.</u>)  Sellers contend that this second method
for computing damages is improper because Cendant has submitted
no admissible evidence that it actually suffered a 20% response
drop as a result of any post-Acquisition switch by Credentials to

two-step telemarketing.[40]   (Pls.' Reply Mem. of Law at 2-4.)   On
the contrary, Sellers say, the alleged 20% response difference
was between two different one-step telemarketing campaigns.

The document on which Cendant chiefly relies to corroborate
the alleged 20% drop is a Business Review Summary by one of its
employees.   (Lawler Aff. of Feb. 28, 2007, Ex. 52, CSI-CEN
265101.)   An excerpt from that Business Review Summary read:
"[c]alling at Credentials vendors doing 20% lower with Cendant
legal scripts".   (Lawler Aff. of Feb. 28, 2007, Ex. 52, CSI-CEN
265101.)   This document, however, was not produced for discovery
until April 7, 2006.[41]   (Petrella Dec. ¶ 109.)

April 7, 2006 — just one month prior to the close of fact
discovery — was far too late.   Not only had Sellers submitted a
document request for documents relating to "all counterclaim
allegations" as early as July 9, 2002 (Petrella Dec., Ex. 3;
Petrella Reply Dec., Ex. A), but also this Court admonished
Cendant on July 7, 2005 that it must turn over all documents
related to counterclaim damages:

MR. PETRELLA:  I don't want the overall point to
               get lost in the specificity of the

_____

[40] Two-step telemarketing would have required Credentials to
obtain written authorization from consumers before obtaining
their credit reports.

[41] Cendant does not contest this date of production.

103

> legal bills.  What we really need –
> Mr. Lawler is saying we've given
> them what we've got, except for the
> bills.   I  think  we're  entitled,
> particularly  under  the  Rule  26
> disclosures – we need for them to
> list for us in writing, we claim
> this  as  damages.    Here  are  the
> documents that we have.   We claim
> this item as damages.   This is the
> amount. Here are the documents that
> we  have,  for  anything  they're
> claiming  for  damages,  other  than
> just saying simply, you know, the
> amount we paid for the company is a
> total  loss.   I just want to make
> sure it's clear on the record that
> we need that.

THE COURT:    Well, just as you're going to give
them detailed information as to who
said what, when and where, they're
going   to   give   you   detailed
information as to why they say they
have the damage and the source and
the amount.  All right?

MR. LAWLER:    Yes.

THE COURT:    Everbody happy?

MR. LAWLER:    Yes.

(Tr., Jul. 7, 2005, 41:9-42:3, at Petrella Dec., Ex. 27.)  Upon

Cendant's noncompliance with that order, Sellers petitioned

Magistrate Judge Douglas F. Eaton, to whom this case had been

referred for general pre-trial supervision, for a further order

requiring Cendant to turn over documents relevant to its alleged

counterclaim damages.  (See Memorandum & Order of Magistrate

Judge Eaton, dated Nov. 16, 2005, at 6, at Petrella Dec., Ex. 28.)  The Business Review Summary, as a result of this perpetual legal wrangling, was finally produced, but not until April 7, 2006.  In light of the significant relevance of this document and the prejudice which would be suffered by Sellers from the mere month they had to depose fact witnesses (most of whom had already been deposed) on the document's meaning, Cendant is precluded from submitting the Business Review Summary at Exhibit 52 of Lawler's Affidavit of February 28, 2007.[42]

The only other evidence on which Dunbar – or a jury – could rely for proof that Credentials' response rate dropped when it switched to two-step telemarketing are the reports from Cendant's telemarketing tests in July of 1998.  The record shows that after the Acquisition, Cendant tested the response rate of Credentials' one-step telemarketing script against the response rates of two telemarketing scripts entitled "Cendant Legal".  (Counterclaim-Defs.' 56.1 Stmt. ¶¶ 133-134, Ex. 61, Ex. 62.)  One of the "Cendant Legal" scripts has been produced and is a one-step script.  (Counterclaim-Defs.' 56.1 Stmt. ¶¶ 141-142, Ex. 5.)  The

---

[42] The Court also notes that even were this document admitted, a reasonable jury could not find it to be determinative.  Not only are many of the records upon which the Business Review Summary is allegedly based lost or destroyed, but also the document is interspersed with redactions and incomplete sentences rendering it difficult to understand.

other "Cendant Legal" script, which achieved a lower response rate than the tested Credentials' one-step script, has not been produced because it was either lost or destroyed by Cendant.

The missing "Cendant Legal" script is not proof of a drop in Credentials' response rate for two reasons.  First, Cendant cannot rely on a document that it lost or destroyed as affirmative evidence supporting its own counterclaims.  Second, the data compiled from the July 1998 telemarketing tests identifies the missing "Cendant Legal" script as 6200003CIT.  (Counterclaim-Defs.' 56.1 Stmt., Ex. 61, Ex. 62, Ex. 63.)  The use of the "CIT" tag indicates that the script was used to market Credentials to Citibank customers.  (Counterclaim-Defs.' 56.1 Stmt. 56.1 Stmt. ¶ 150.)  Because Cendant did not commence two-step telemarketing for Citibank until September 1, 1998, 6200003CIT could not have been a two-step telemarketing script when it was tested two months earlier.  Indeed, Sellers asserted in their 56.1 Statement that:

> Cendant did not begin two-step telemarketing for Citibank until September 1, 1998 ([Counterclaim-Defs.' 56.1 Stmt.,] Ex. 38.) ([Counterclaim-Defs.' 56.1 Stmt.,] Ex. 10, Sheehan Dep., T37:21-38:3.) Prior to September 1, 1998, Cendant continued to use one-step scripts for Citibank co-marketing solicitations (Id.) . . . . Therefore, because the test at issue was conducted on the Citibank file in July 1998 ([Counterclaim-Defs.' 56.1 Stmt.,] Ex. 62, "TEST 1") — a full month before Citibank switched to two-step telemarketing — Script

6200003CIT could not have been two-step.

(Counterclaim-Defs.' 56.1 Stmt. ¶¶ 150-151.)   Instead of acknowledging that Sellers' assertion is based on three different pieces of affirmative evidence, Cendant retorts by seeking to strike Sellers' statements:

150.   Cendant disputes the facts set forth in Paragraph 151 of the Counter-Defendants' Rule 56.1(a) Statement.  Of Dr. Dunbar's two damage models, only the "benefit of the bargain" model utilizes the assumption that telemarketing response rates dropped by 20% after Cendant brought the Credentials marketing materials into compliance with the law (Ex. 51, Report of Dr. Frederick C. Dunbar at 8-10.)  Dr Dunbar's "out of pocket loss" model does not utilize any such assumption. (Id. at 4-8.)  Finally, the basic data occurs, at a minimum, at CSI/CEN 265101 ("Credentials: Calling at Credentials vendors 20% lower with Cendant legal scripts.") (Ex. 52, JX 574 at CSI/CEN 265101.) [43]

151.   Cendant disputes the facts set forth in Paragraph 151 of the Counter-Defendants' Rule 56.1(a) Statement.  Despite the requirements of Local Rule 56.1(d), the Counter-Defendants fail to cite to any document, testimony, discovery answer, or any other evidence, let alone admissible evidence, in support of their contentions.   Cendant moves to strike Paragraph 151 of the Counter-Defendants' Rule 56.1(a) Statement.  Further, of Dr. Dunbar's two damage models, only the "benefit of the bargain" model utilizes the assumption that telemarketing response rates dropped by 20% after Cendant brought the Credentials

_____

[43] **Ex. 52 of Counterclaim-Pls.' 56.1 Statement is the excluded Business Review Summary, addressed** supra.

107

> marketing materials into compliance with the
> law (Ex. 51, Report of Dr. Frederick C. Dunbar
> at 8-10.)  Dr Dunbar's "out of pocket loss"
> model does not utilize any such assumption.
> (<u>Id.</u> at 4-8.)  Finally, the basic data occurs,
> at a minimum, at CSI/CEN 265101 ("Credentials:
> Calling at Credentials vendors 20% lower with
> Cendant legal scripts.") (Ex. 52, JX 574 at
> CSI/CEN 265101.)

(Counterclaim-Pls.' 56.1 Stmt., ¶¶ 150-151.)  Cendant does not

meet its burden in this response to produce its own evidence to

contradict Sellers' evidence about 6200003CIT.

For these reasons, Cendant has produced no evidence to prove

to a reasonable jury that it suffered damages as a result of

Credentials' alleged switch to two-step telemarketing.

Accordingly, Sellers' Motion for Summary Judgment on Cendant's

indemnification counterclaim is hereby GRANTED.


(2)  <u>Common Law Fraud Counterclaim (Counterclaim One)</u>

Cendant's common law fraud counterclaim as asserted in

Counterclaim One alleges that Sellers knew about Credentials'

violations of the FCRA and the Experian Agreement prior to the

Acquisition, but failed to inform Cendant about those violations.

Counterclaim-Defendants[44] disagree.  Cendant's fraud counterclaim

---

[44] In reference to this Counterclaim, Sellers are included
within the moniker "Counterclaim-Defendants".  The term
"Counterclaim-Defendants" is used, rather than "Plaintiffs" or
"Sellers", because Cendant impleaded additional parties on

shall be dismissed for three reasons.

First, as stated in Section II(B)(5), _supra_, a fraud claim should be dismissed as redundant when the only fraud alleged is that the defendants – or in this case, the counterclaim-defendants – were not sincere when they promised to perform under the contract.  First Bank of Americas, 257 A.D. 2d 287, cited in Spencer Trask, 383 F. Supp. 2d at 453.  Cendant's allegation that Sellers failed to tell them about Credentials' alleged violations of the FCRA and the Experian Agreement is exactly the same as Cendant's allegation that Sellers breached their warranties in the SPA by not telling it that Credentials was in violation of the FCRA and the Experian Agreement.

Second, Cendant has not submitted proof that any of the three Bridgestone/Firestone exceptions apply.  See Section II(B)(5) supra, citing Bridgestone/Firestone, 98 F.3d at 20.  It has not alleged an independent legal duty, it has not alleged a fraudulent misrepresentation collateral or extraneous to the SPA, and it has not alleged any recoverable special damages.  To the extent that Cendant requested punitive damages in its Amended Answer (see Cendant's Amended Answer at 85), it has set forth no evidence of any "public harm".  See Clark-Fitzpatrick, 70 N.Y.2d

---

Counterclaim One.

at 389 (a party liable for a contract-related fraud must have
directed a harm against the public before being subjected to
punitive damages).

Third, even were Cendant's fraud counterclaim not redundant
with its indemnification counterclaim, Cendant has not proven any
damages stemming from Sellers' alleged failure to tell Cendant
about its use of one-step telemarketing.

Accordingly, Counterclaim-Defendants' Motion for Summary
Judgment on Cendant's common law fraud counterclaim is hereby
GRANTED.


      (3)  <u>Breach of Fiduciary Duty Counterclaim (Counterclaim
           Three)</u>

Cendant's third counterclaim is against
Plaintiffs/Counterclaim-Defendants Robert E. Richardson, M.
Gerald Keehan, and Michael Cossel, and alleges that they knew of
Credentials' use of one-step telemarketing but failed to inform
Cendant about it despite an alleged duty of care they owed to
Cendant.  This counterclaim is barred by Section 8.6 of the SPA
which makes indemnification the sole remedy "for any claim for
monetary damages arising out of or relating to [the SPA]", other
than fraud.  (SPA, § 8.6.)  Cendant argues that "[t]he fiduciary
duty claims . . . do not relate to the Agreement; they would have

110

breached their fiduciary duties regardless of whether Sellers breached the representations and warranties in the SPA". Cendant's contention that the fiduciary duty claims are unrelated to the SPA is specious.  Recovery against Richardson, Keehan, and Cossel would duplicate recovery for any breaches by Sellers of their alleged Section 3.1(f)(i) and Section 3.1(p) obligation to inform Cendant of Credentials' one-step telemarketing.  Moreover, Cendant's fiduciary duty counterclaim is, if not another iteration of its indemnification counterclaim, at least "related to" the SPA.  (See SPA, § 8.6.)  Had the parties not executed the SPA, Cendant would have suffered none of the damages which it alleges gave rise to its fiduciary duty counterclaim in the first instance.[45]

     Accordingly, Plaintiffs/Counterclaim-Defendants Richardson,

_____

     [45] It is worth nothing that the "indemnification as sole remedy" provision does not bar Plaintiffs' breach of contract claims.  Cf. Merrill Lynch & Co., Inc. v. Alleghany Energy, Inc., 2005 WL 832050, at *2-3 (S.D.N.Y. Apr. 12, 2005) (permitting plaintiff's breach of contract claim to proceed despite contract clause which provided that indemnification was the sole remedy for breaches thereunder); Tomoka Re Holdings, Inc. v. Loughlin, 2004 WL 1118178, at *1, *5 (S.D.N.Y. May 19, 2004) (same); Polycast Technology Corp. v. Uniroyal, Inc., 792 F. Supp. 244, 273 (S.D.N.Y. 1992) (in case where parties signed stock purchase agreement containing "indemnification as sole remedy" clause, district court found that breach of warranty claim may be brought, noting that the distinction between an indemnification claim and a breach of warranty claim "is technical, not substantive").

Keehan, and Cossel's Motion for Summary Judgment on Cendant's

breach of fiduciary duty counterclaim is hereby GRANTED.


_____(4)   Breach of the Covenant of Lawful Operation Counterclaim
             (Counterclaim Four)

_____In Counterclaim Four, Cendant alleges that Sellers violated

Section 4.2(c) of the SPA because Credentials was in violation of

the FCRA at the time the SPA was executed.  Section 4.2 of the

SPA provided, in relevant part:

> [D]uring the period from the date of this Agreement
> until the Closing Date, the Sellers and
> [Credentials] further agree that:
>
> . . . .
>
> [Credentials] shall, and the Sellers shall cause
> [Credentials] to duly comply in all material
> respects with all laws, regulations and decrees
> applicable to it and to the conduct of its
> business.

(SPA, § 4.2.)  The breach of the covenant of lawful operation

counterclaim not only is merely another iteration of the

indemnification counterclaim, but it also must fail as a matter

of law because Section 4.2 of the SPA warrants that Credentials

was not in violation of any law during the time span between the

date of the Agreement and the Closing Date.  The date for both of

those events was April 10, 1998.  (See SPA, § 2.4 ("The closing

of the Acquisition . . . shall take place at 11:00 a.m., New York

112

time, on April 10, 1998 . . . .") and SPA Cover Page.)  Even were

the Court to interpret "the time between" April 10, 1998 and

April 10, 1998 to include April 10, 1998, Cendant has put forth

no evidence that Credentials violated the FCRA on that day.

Accordingly, Sellers' Motion for Summary Judgment on Counterclaim

Four is hereby GRANTED.


        (5)   Unjust Enrichment (Counterclaim Five)

        Cendant's unjust enrichment counterclaim, which alleges that

Counterclaim-Defendants[46] have been unjustly enriched by

retaining the money they earned from the Acquisition because they

misrepresented Credentials' use of one-step telemarketing, also

cannot survive as a matter of law.  "Generally, quasi-contractual

relief, such as unjust enrichment, is not permitted when an

express agreement exists that governs the dispute between the

parties."  Bridgeway Corp. v. Citibank N.A., 132 F. Supp. 2d 297,

305 (S.D.N.Y. 2001).  The SPA is an express agreement, and

therefore bars Cendant's unjust enrichment counterclaim.


---

        [46] As with the common law fraud counterclaim, the Court uses
"Counterclaim-Defendants" here, not "Plaintiffs" or "Sellers",
because Cendant impleaded the additional Counterclaim-Defendants
on the unjust enrichment counterclaim as well.

Accordingly, Counterclaim-Defendants' Motion for Summary Judgment on Cendant's unjust enrichment counterclaim is hereby GRANTED.


E.   Sellers' Motion for Sanctions

Sellers have moved for sanctions against Cendant for numerous alleged discovery abuses, including spoliation of evidence and pervasive delay in document production.  According to the Second Circuit:

> Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses, see New York State NOW v. Terry, 886 F.2d 1339, 1354 (2d Cir. 1989), and for the spoliation of evidence. See West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).

Reilly v. Natwest Markets Group Inc., 181 F.3d 253, 267 (2d Cir. 1999).  See also Residential Funding Corp. v. DeGeorge Financial Corporation, 306 F.3d 99, 107 (2d Cir. 2002) (describing the district court's power to impose sanctions for abusive litigation practices as "broad"); Friends of Animals, Inc. v. U.S. Surgical Corp., 131 F.3d 332 (2d Cir. 1997) (same).  The imposition of sanctions for discovery abuse is reviewed on appeal only for the district court's abuse of discretion.  Selletti v. Carey, 173 F.3d 104, 110 (2d Cir. 1999).

"Courts have also noted Rule 37 sanctions may be applied

114

both to penalize conduct that warrants sanctions and 'to deter those who might be tempted to such conduct in the absence of such a deterrent.'" Metropolitan Opera Assn. v. Local 100, Hotel Employees & Restaurant Employees International Union, 212 F.R.D. 178, 219 (S.D.N.Y. 2003), quoting National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 643 (1976). Factors considered by district courts to determine whether to impose sanctions for discovery abuses include: "'(a) willfulness or bad faith of the noncompliant party; (b) the history, if any, of noncompliance; (c) the effectiveness of lesser sanctions; (d) whether the noncompliant party had been warned about the possibility of sanctions; (e) the client's complicity; and (f) prejudice to the moving party.'"  In re Sumitomo Copper Litig., 204 F.R.D. 58, 60 (S.D.N.Y. 2001) (quoting Yucyco, Ltd. v. Ljubljanska Banka, No. 96 Civ. 4274, 2001 WL 699135, at *4 (S.D.N.Y. June 20, 2001)).

 Sellers seek sanctions against Cendant in part because Cendant allegedly destroyed many financial and marketing reports detailing Credentials' performance in 1998 during the year following the Acquisition.  Cendant has all but conceded that much of this evidence has been lost.  (See Defendant's Amended Responses to Plaintiffs' Interrogatories 7 & 8 Contained in the Second Set of Document Requests and Interrogatories, at Pls.'

115

56.1 Stmt. on Count Four, Ex. 38 (where Cendant admits that "revenue based information for 1997 and 1998 has not been found.").)

There is no question that these documents would have been highly relevant to the case.  They could have answered questions about whether Credentials met the contingent payment threshold, among other things.  The submissions of the parties support the conclusion that Cendant lost most, if not all, of these documents between January and March of 1999, when Cendant was converting Credentials' old data to its own database.  Indeed, internal Cendant emails evince a chaotic effort to execute their data conversion process smoothly.  (Pls.' 56.1 Stmt. on Count Four, Exs. 28-35.)

True, the data conversion process took place before the filing of this lawsuit.  But even if Cendant did not have an obligation at that time to preserve these records for purposes of this lawsuit, see Tri-County Motors, 2007 WL 1932917, at *12 (finding that parties have duty to preserve documents relevant to litigation after they are on notice that litigation may be brought against them), it did have a duty to preserve these records pursuant to the contingent payment clause.

Even were this Court to hold that Cendant did not have a duty to Sellers to preserve those records during the data

conversion process, Cendant's failure to admit sooner to its
losing Credentials' 1998 financial data is sanctionable.
Admitting to the fact of the lost evidence three-and-a-half years
after Sellers originally requested it was in bad faith.  (See
Defendant's Amended Responses to Plaintiffs' Interrogatories 7 &
8 Contained in the Second Set of Document Requests and
Interrogatories, at Pls.' 56.1 Stmt. on Count Four, Ex. 38.)
Cendant does not contend that it did not know or could not have
known that the evidence was lost for the three-and-a-half years
which followed Sellers' first request for it.  Indeed, any such
argument would be frivolous because Cendant was the party
responsible for the evidence; there is no one else who could have
known better whether the evidence was missing.  Admitting to the
data's loss at an earlier date would have avoided needless
litigation on the matter, including appearances related to that
data before this Court and before Magistrate Judge Eaton.
Sellers' appearance before this Court on July 7, 2005, Sellers'
appearance before Magistrate Judge Eaton to compel disclosure of
the 1998 financial data (see Order, dated Nov. 16, 2005, at
Petrella Dec., Ex. 28), Sellers' preparation of their papers on
the present Motion for Sanctions, as well as the formulation of
general litigation strategies in anticipation of evidence that
Sellers never got, all took place because of Cendant's failure to

disclose sooner the fact of its having lost Credentials' 1998 financial data.  This delay not only generated needless legal fees for Sellers, but also wasted the Court's time.

It does not end there.  Cendant submitted objections to all 144 of Sellers' initial document requests.  Many of those objections were frivolous and vexatious.  (See, e.g., Tr. 25:24 - 26:23, dated Feb. 6, 2003.)  As a result of its frivolous objections, Cendant already has faced sanctions in the course of litigating this case.  (See Memorandum & Order of Magistrate Judge Eaton, dated Feb. 22, 2006 at Petrella Dec., Ex. 30 (giving Cendant two options, one of which was paying a sanction of $5,000.00); Memorandum & Order of Magistrate Judge Eaton, dated Mar. 15, 2006, at Petrella Dec., Ex. 32 (sanctioning Cendant by setting certain provisions on deposition of former Credentials president).)  As well, this Court has admonished the parties more than once about their litigiousness.  For example, on March 15, 2006, the Court wrote:

> [T]he Court expects that there will be no further discovery disputes.  However, with the history of the parties, the Court's expectations may be overly optimistic.  Should discovery disputes arise, and the Court strongly encourages the parties to resolve them by themselves, as a last resort, the parties are directed to Judge Eaton.  The Court greatly appreciates Judge Eaton's excellent supervision of this complicated matter and for his patience with these parties.

(Order, Mar. 15, 2006, at 18; see also Order, Mar. 15, 2006, at 17 (referring to the "litigiousness" of the parties).)  Despite this admonishment, the parties presented at least three more discovery disputes to Magistrate Judge Eaton on or after March 15, 2006, each of which Judge Eaton decided in Sellers' favor. (See Memorandum & Order of Magistrate Judge Eaton, dated Mar. 15, 2006, at Petrella Dec., Ex. 32; Memorandum & Order of Magistrate Judge Eaton, dated Jun. 9, 2006, at Petrella Dec., Ex. 34 (referring to Defendants' letter submission as beginning with a "barrage of procedural demurrers"); and Memorandum & Order of Magistrate Judge Eaton, dated Aug. 11, 2006, at Petrella Dec., Ex. 33.)

Moreover, the Court ruled on October 4, 2006 that a summary judgment motion by Defendants would be "a dilatory tactic only." (Memo-Endorsed, dated October 4, 2006.)  While the Second Circuit instructed this Court to permit Defendants to file their motion, the Circuit did not reverse the finding that such motion would be dilatory.  In fact, the Circuit expressly admonished the parties that the permission to file a summary judgment motion did not relieve them of their "obligations to satisfy Rule 11".  (See Order, No. 06-4844-op (2d Cir.), dated Dec. 12, 2006.)

The precise monetary setback Cendant's discovery abuses has imposed on Sellers has not been calculated by Sellers' Counsel.

However, Sellers' Counsel estimates their total legal fees at
$4,800,000.00, and requests that 25% of those fees be awarded to
Sellers as sanctions for Cendant's bad faith.  (Petrella Dec. ¶
124.)  While 25% is unduly burdensome, an award of 15% of
Sellers' fees would be a deterrent to Cendant against future
behavior of the sort it has displayed in the course of this
litigation.  In light of Cendant's bad faith, and Rule 37's
purpose not only "to penalize conduct that warrants sanctions,
[but also] 'to deter those who might be tempted to such conduct
in the absence of such a deterrent'", <u>Metropolitan Opera Assn.</u>,
212 F.R.D. 178, 219 (S.D.N.Y. 2003), this Court hereby ORDERS
Defendant Cendant Corporation to pay $720,000.00 to Sellers.[47]
<u>Cf.</u> <u>In re September 11th Liability Insurance Coverage Cases</u>, 2007
WL 1739666, at *19 (S.D.N.Y. Jun. 18, 2007) (where party
requested more than $5 million in sanctions to cover legal fees
for opponent's delays in discovery, district court imposes
$500,000.00 in sanctions on opponent, noting that "[a]lthough the
lawyers [requesting sanctions] represent that their accounting
for fees and expenses separates" the sanctionable conduct from

_____

[47] This amount equals 15% of Sellers' estimated legal fees,
rather than the approximate 25% they requested.  (<u>Cf.</u> Pls.' Mem.
of Law on Mot. for Sanctions at 13-15 (arguing that Sellers
should be awarded $1,250,000.00, amounting to approximately 25%
of Sellers' total legal fees in this case).)

the non-sanctionable conduct, the court's "own review suggests
that the separations were not based on discrete mentions, and are
subject to a large component of arbitrariness and
unreliability.").  This amount reflects the need for punitive
action against Cendant for its bad faith, plus a reasonable
estimate of the wasted legal fees and resources expended by
Sellers as a result of Cendant's vexatiousness.[48]

### III. CONCLUSION

For the reasons stated above:

(1)  Defendant Cendant's Motion for Summary Judgment is
     DENIED as to Counts Three and Four of the Third Amended
     Complaint, but GRANTED as to Counts One, Two, Six,
     Seven, and Eight of the Third Amended Complaint

(2)  Defendant Silverman's Motion for Summary Judgment is
     GRANTED;

(3)  Defendant Katz' Motion for Summary Judgment is GRANTED;

(4)  Summary judgment is GRANTED in favor of Cosmo

---

[48] Because the Court granted, _supra_, summary judgment in
favor of Sellers on Counts Three and Four, Sellers' request in
their Motion for Sanctions that the Court strike Cendant's
Amended Answer and Counterclaims is moot and need not be
considered.  For the same reason, Sellers' requests in their
Motion for Sanctions for an adverse inference jury instruction at
trial and for the preclusion of certain evidence at trial also
need not be considered.

Corigliano on all claims against him;

(5)   Counterclaim-Defendants' Motion for Summary Judgment is
      GRANTED in its entirety;

(6)   Sellers' Motion for Summary Judgment on Count Four of
      the Third Amended Complaint is GRANTED; and

(7)   Sellers' Motion for Sanctions is GRANTED IN PART and
      DENIED IN PART.  Cendant shall pay Sellers $720,000.00
      in sanctions.

(8)   Summary judgment is GRANTED in Sellers' favor on Counts
      Three and Four of the Third Amended Complaint.

Accordingly, Cendant owes Sellers jointly and severally a
total of $94,257,063.61, which represents $50,000,000.00 (plus
$33,472,610.55 of prejudgment interest) due under Count Three,
$562,176.00 (plus $431,246.82 of prejudgment interest) due for
the first Section 2.3(c) tranche pursuant to Count Four of the
Third Amended Complaint, $3,200,000.00 (plus $2,431,032.24 of
prejudgment interest) due for the second Section 2.3(c) tranche
pursuant to Count Four of the Third Amended Complaint,
$2,000,000.00 (plus $1,439,998.00 of prejudgment interest) due
for the Section 2.3(d) tranche pursuant to Count Four of the
Third Amended Complaint, and $720,000.00 in sanctions.

Sellers also shall file and serve within thirty days of the
date of this Opinion an affidavit which explains their attorneys'

fees related to their Count Four breach of contract claim.
Cendant shall respond, if it so desires, within thirty days of
receipt of Sellers' affidavit.


     SO ORDERED.

DATED:     New York, New York
           *September 7, 2007*

                                   _Deborah A. Batts_
                                   Deborah A. Batts
                                   United States District Judge